IN THE SUPREME COURT OF MISSISSIPPI
NO. 98-CA-00404-SCT

*RICHARD J. CLARK, JR.*

*v.*

*VIRGIE L. CLARK*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/11/1998 |
| TRIAL JUDGE: | HON. WILLIAM L. STEWART |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JOSEPH R. MEADOWS |
| ATTORNEY FOR APPELLEE: | KAYE J. PERSONS |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 11/04/1999 |
| MOTION FOR REHEARING FILED: | ; denied 01/27/2000 |
| MANDATE ISSUED: | 2/3/2000 |

## BEFORE PRATHER, C.J., MILLS AND COBB, JJ.

## PRATHER, CHIEF JUSTICE, FOR THE COURT:

### INTRODUCTION

¶1. This domestic relations case involves the dissolution of a 33-year marriage. The parties had six children, three of whom were minors at the time of the divorce. The record reflects that Richard J. Clark, Jr., appellant, left the marriage and attempted to get Virgie L. Clark, appellee, to agree to a divorce based on irreconcilable differences. She refused and filed for separate maintenance. As he had threatened, he then ceased to support her financially. She filed for separate maintenance and received a temporary order of support, with which he failed to comply. He later obtained a divorce in Nevada. She amended her complaint, sought a divorce, and the case *sub judice* arises from the chancellor's determinations regarding child and spousal support and the distribution of the marital property.

### STATEMENT OF THE CASE

¶2. On February 29, 1996, Virgie L. Clark (hereinafter Virgie) filed, in the First Judicial District of the Chancery Court of Harrison County, for separate maintenance from Richard J. Clark, Jr. (hereinafter Richard). On April 7, 1997, upon a subsequent motion by Virgie, the complaint was amended to include the alternative claim of divorce.

¶3. A hearing was held April 22, 1997, and the chancellor granted temporary relief. Specifically, custody of the parties' three minor children was granted to Virgie. The chancellor also ordered Richard to pay $252.34 in child support each month and $100 per month in alimony pendente lite. Richard was further ordered to

provide the following for Virgie and the three minor children: medical insurance and payment of medical bills; maintenance of the marital home (including taxes, insurance, and termite treatment); automobile expenses for one vehicle; and costs in the amount of $3,237.39.

¶4. On July 7, 1997, Richard moved to dismiss Virgie's complaint as moot, based on the fact that a Nevada court had granted a divorce to Richard on May 29, 1997. The chancellor denied this motion, because the Nevada decree lacked "(i) any affidavit pursuant to the Uniform Child Custody Jurisdiction Act and (ii) litigation of any and all issues touching on alimony, child custody, child support, and distribution of marital property."

¶5. A trial was held July 15, 1997, and the chancellor found that Richard had deserted the marriage without cause in or around September, 1994. The chancellor awarded custody to Virgie of the three minor children. Richard was ordered to pay (a) $200 per month, per minor child, or $600 per month, in child support -- unless the child was enrolled in college; (b) medical insurance for Virgie and the minor children, should Virgie lose her medical insurance coverage for any reason; (c) all medical expenses not covered by Virgie's insurance; (d) college tuition, books, housing, meals, and living expenses equivalent to the cost of attending a "state-supported university of Mississippi", until the parties' minor children reach the age of 21 or completed college study, whichever was later; (e) $500 per month alimony, to be offset by any rental income from the time-share unit and from two mobile homes that were on the property with the marital home, and were occupied by members of Virgie's family; (f) life insurance premiums on a $100,000 life insurance policy, with Virgie as beneficiary; (g) Virgie's car tag; and, (h) $3,000 for Virgie's attorney fees, plus court costs. Furthermore, Virgie was awarded (a) the parties' homestead and furnishings, valued at approximately $99,500; (b) the parties' time-share unit; and, (c) the two mobile homes located on the homestead property.

¶6. With regard to Richard's business (J & R Tire Service), the chancellor awarded Richard exclusive use, possession, and control, as well as all the income therefrom.[1] However, this award was subject to an equitable lien in favor of Virgie of a one-half interest in the business -- in order to ensure Richard's compliance with the divorce decree.

¶7. Upon Virgie's motion, the chancellor also found Richard in contempt of the temporary order and awarded Virgie $400 for past due alimony pendente lite; $2,584.11 for medical bills; $562.31 for ad valorem tax on the marital home; $626 for insurance on the marital home; $7,246.41 for termite treatment for the marital home; and, $32.14 for a car tag.

¶8. On September 24, 1997, Richard filed a motion to reconsider, which, after a hearing, the chancellor granted, in part. Specifically, the chancellor found that:

> . . . from the testimony and demeanor of the witnesses, as well as the documentary evidence presented at the original hearing of this action, that not only was Richard J. Clark, Jr. less than forthcoming with true and verifiable financial information, but the Court was convinced he was actually attempting to hide or protect what should be considered assets in equitable distribution. The Court reiterates and upholds that finding, however after careful reflection finds that the Judgment heretofore entered in this cause on the 9th day of September, 1997, is overly burdensome to the defendant, even at his actual income level, and therefore the judgment must be reconsidered and adjusted to meet the equities.

¶9. Based on that finding, the chancellor ordered that the college education expenses of the minor children be equally divided between the parties, but, given the disparity in the incomes of the parties, Richard would no longer be relieved of his monthly support obligation (of $200 per child per month) while the children were in college.

¶10. The chancellor also amended the portion of the original judgment regarding alimony. Originally, Richard was ordered to pay $500 per month alimony, to be offset by any rental income Virgie received from certain properties. In the amended judgment, the chancellor found that the fair rental values were $350 per month. Accordingly, Richard was ordered to pay $150 in monthly alimony.

¶11. With regard to medical insurance, the chancellor held that Richard should be responsible for one-half the medical expenses, not covered by insurance, for Virgie and the three minor children. (Richard had originally been ordered to pay all the medical expenses, not covered by insurance.) The chancellor also held that Virgie had sufficient assets to pay for her own car tag, and relieved Richard of that obligation.

¶12. Richard appeals, and raises the following issues for consideration by this Court:

**A. Whether the trial court erred in the amount of support to be paid on behalf of appellee and the parties minor children?**

**B. Whether, in making the division of marital assets, the trial court erred in failing to follow established guidelines and such divisions, failing to support its decision with correct finding of fact, and failing altogether to support its decision with conclusions of law to aid in this appellate review?**

¶13. On cross-appeal, Virgie raises the following issue:

**C. Whether the chancellor's initial judgment as to the amount of alimony, the percentage of college expenses, and the percentage of uninsured medical expenses should be reinstated because they were supported by substantial credible evidence and were neither manifestly wrong nor clearly erroneous under the applicable legal standard?**

## STATEMENT OF THE FACTS

¶14. The parties married September 20, 1963, when Virgie was 15. They had six children. At the time of the hearing, three of the children were minors (Kevin, age 20; Mark, age 19; and Colstrum or "Cokie", age 15), and were residing with Virgie. Kevin was attending school at Mississippi State University. Mark had just completed high school, and Virgie planned for him to enroll in college the following September.

¶15. Richard admitted that he left Virgie July 27, 1993. Virgie stated that he had left her twice before. Virgie also stated that they were "husband and wife" for "the majority of" 1994, but the marriage had been over since the beginning of 1995. Richard testified that he obtained a divorce in Nevada May 30, 1997.

¶16. Virgie, age 49, testified that she was the "exclusive housekeeper" at Casino Magic, from 8:00 p.m. to 4:00 a.m.; however, she had hurt her leg, and, at the time of the hearing, she was working 1:00 to 9:00 a.m. "polishing brass", a "light" duty. Her gross salary for this job was approximately $1,080 per month.

¶17. Virgie also performed a cleaning services in Diamondhead, where she cleaned 1-2 houses per day

(except "every other Monday . . . Wednesday . . . and . . . Friday"). Her average income from this job was $80-$110 per week. Virgie had worked throughout the marriage, "except for that first maybe three years."

¶18. Virgie stated that she was not in good health, and that she was receiving treatment (including medication) for diabetes and high blood pressure. She had also had breast surgery (which led to the discovery of her diabetes). In addition, "they [had] found something [in her chest] but they're watching it. So [Virgie did not] know how [that] was going to work out."

¶19. She stated that it was very difficult to work day and night under these circumstances. She could not drive, due to the danger that she might "pass out and hurt someone else." Furthermore, her work schedule caused problems in monitoring these conditions. Also, Virgie did not get the proper amount of needed rest. For this reason, she planned to quit her night job, after the divorce. This meant that she would lose her health insurance (which she had been paying for with deductions from her pay check, and, which she felt had a high deductible and did not pay 100%).

¶20. The deposition of Virgie's family doctor, David F. Roberts, M.D., was admitted. Dr. Roberts' testified that he had treated Virgie for diabetes and hypertension since September 21, 1995. Dr. Roberts also prescribed medication to Virgie for elevated cholesterol levels. Dr. Roberts saw Virgie every few weeks to monitor these conditions. He opined that Virgie "had a pretty significant problem with diabetes." At various times, Dr. Roberts had treated Virgie's diabetes with the maximum dose of oral medication. He considered putting her on insulin injections.

¶21. Based on her medical condition (which was unlikely to resolve), Dr. Roberts opined that Virgie should be permanently restricted to one job. Furthermore, based on a chest x-ray performed by another doctor, Roberts testified that Virgie had an enlarged heart (cardiomegaly), as a result of high blood pressure. This made the treatment of Virgie's hypertension "very critical to her health because these findings are potentially very, very serious."

¶22. Provided that Virgie continued to receive treatment,[2] Dr. Roberts believed she could work one job. A day job would allow Virgie to keep a regular schedule and make it easier to control her blood sugar and stress levels..

¶23. Richard testified that he operated a tire repair shop in New Orleans, which he began in July or August, 1993. The business was strictly for installing and repairing used tires and required a balancing machine, jacks, and air tools. Richard testified that he invested $150 capital in the business, which was all that he had. He did not have to pay rent the first year, because he arranged to make repairs to the building for the landlord. He did not have any money for electricity. He had to borrow a generator to run the business.

¶24. Richard became business partners with Jeanette Magee, age 35-40, but stated that she was not his partner at the time of the hearing. In addition, Richard had two shops at one point, but he only had one shop at the time of the hearing.

¶25. Richard, age 52, denied that he had intimate relations with Magee. Richard named his business J&R Tire Service, which stands for "Junior's Tire Service."[3] Originally, Richard leased property for his business at the rate of $900 per month. Then, he "leased to own"[4] a different property for his business from Jennifer LaNasa in July, 1995. Richard testified that he paid $300 per month rent, and that he employed two full-time workers at the rate of $250 per week. He also paid one part-time worker $42.50 per day for

weekend work. The employees were always paid cash.

¶26. Richard stated that he conducted all his business on a strictly cash basis. He did not keep payroll records, but he did keep records of federal and state taxes. He did not file employment tax returns. He stated that he had not filed income tax returns since 1993, however his 1994-1996 tax returns were made part of the record, and Richard testified that those returns reflected his income. Richard reported a loss of $116 in 1994; requested a refund of $734 in 1995; and showed an income of $30,500 and a net profit of $9,600 in 1996. Richard also stated that he was in good health.

¶27. In addition to his business endeavors, Richard bought property on July 11, 1995, applied for a building permit, and built a 3,700 square foot home with Jeanette Magee in Hancock County, Mississippi. Richard testified that they bought the property as an investment, and that they each paid $4,500 for the lot. In addition, Richard stated that, on October 19, 1995, he conveyed his interest in that property to Magee for $4,500. On February 16, 1996, Magee conveyed her interest in the property to Patrick Clark, Richard's nephew.

¶28. According to Richard, his business burned, and he needed money to rebuild. His nephew did not pay him for the house; rather, they were "swapping it out" -- his nephew's help in the tire business for Richard's help constructing the home.[5] Richard stated that he personally did the work on all phases of the construction of the home, including plumbing, air conditioning, concreting the driveway, and roofing.[6]

¶29. Virgie testified that, after he left in 1993, Richard sporadically gave her $250-$400. Virgie testified, "He never has taken care of me or the children completely since he has been gone." The payments were not regular, they were "however [Richard] saw fit to do it."

¶30. Since the separation, Virgie had seen Richard with large sums of money (such as $4,000 or $5,000) on several occasions.[7] Virgie also said that, at one point during the separation, Richard told her that business had improved and that he would pay her at least $2,500 per month. However, Richard only followed through on that promise one time "and it wasn't all at one time."

¶31. According to Virgie, Richard stopped giving her any money in December, 1995. He told her that, if she did not sign for a divorce, he would not give her "any more money and not to even call him for anything else." Richard admitted that he told Virgie he would never give her any money at all, unless she signed for a divorce based on irreconcilable differences. Richard stated the following with regard to alimony:

> Q. [BY VIRGIE'S ATTORNEY]: Isn't it true, Mr. Clark, that you, in fact, told Virgie Clark that you would never pay her alimony; is that correct?
>
> * * *
>
> A. No, I did not tell her that. But since you asked, I will not.

Richard stated that he would not put any money in Virgie's hands. Even though Richard had been ordered to pay alimony on a temporary basis, he refused: "I said I haven't paid her, and I'm not going to pay it." However, later, when questioned by his own lawyer, Richard apologized for making these statements, and testified that he would attempt to cooperate by any court order, as best he could.

¶32. Nonetheless, Richard had also refused to provide medical insurance or pay medical expenses for

Virgie and the minor children (as ordered in the temporary judgment). He stated that Virgie had medical insurance. Furthermore, Richard had refused to pay for taxes and termite repair on the marital home or for Virgie's car tag (as ordered in the temporary award). Richard stated, ". . . I just don't have the money."

¶33. Virgie admitted that she had received child support from Richard, since the temporary order was entered. With regard to child support, Richard testified that he "never stopped doing for . . . or taking care of" his children. Richard stated, "Any time my children would ask me for money, I would respond to them. I would give them what I was able to give them." He also testified that he bought cars for two of his sons, so that they would not have to use Virgie's vehicle.

¶34. Virgie testified that, although Richard had promised to pay for the college education of Kevin, their son, Richard had not done so. In the three semesters Kevin had attended Mississippi State University, Richard had given Virgie $3,400 and Kevin $400. Virgie testified that Richard gave her $2,000 the first semester, but that putting Kevin in school cost her over $4,000. Richard gave her $1,400 the second semester, and he gave Kevin $400 the third semester. Sometimes Richard gave the children $75 or $150, but Virgie stated that Richard "never sent [Kevin] any money . . . to help [Kevin] eat or maintain himself in school." Virgie paid the balance of the tuition and for Kevin's books. She also sent him $250 per month. She estimated tuition costs at over $2,000 per semester.

¶35. The parties owed nothing on the marital home. Virgie valued the four-bedroom, two-bathroom home at $85,000-$95,000; Richard estimated that the home was worth "about $85,000." Virgie valued the furnishings at approximately $4,500. She thought the home was nice "at one time", but it needed "a lot of work". She also stated that over one-half of the property was in a flood zone. Richard did not object to Virgie's residing in the house.

¶36. There were two mobile homes on the property with the marital home, one which Virgie rented to her niece for $200 per month.[8] She also charged her niece $25 per month for water. The other mobile home was being "[set] up", and would, in the future, be occupied by Virgie's mother, sister, and brother-in-law. Virgie only planned to charge them a water deposit, because the trailer was for her 87-year-old mother. Richard testified that Virgie had not shared any of this rental income with him.

¶37. In addition, the parties jointly owned a time-share condominium in Kissimmee, Florida, which they purchased in 1991. Virgie paid approximately $1,900 per year on that debt, but it was almost paid, with only $318 outstanding on the note. Virgie's attorney fees at the time of trial were $4,854.40.

¶38. In addition, Virgie owed for some outstanding dental and medical bills for herself and the children. She was making monthly payments toward that debt. She had finished paying for the breast cancer surgery and the radiation, but Kevin had hurt his leg, and she owed on that. She also had to pay $36 dollars per month for prescriptions for herself and her son Mark. If she did not have insurance, this would cost her approximately $174 per month.

¶39. Apparently, Mark required extensive dental work, which had not been completed, because Virgie testified that his dental bill is approximately $2,000.

¶40. The parties owed nothing on Virgie's car, a 1986 Cadillac. Richard owned a 1983 Ford truck and a 1986 Lincoln continental; a Remington automatic shotgun; a 17-foot boat, which was at the marital home, where Virgie lived[9]; and a couple of fishing reels. He claimed that, other than his interest in the marital

home and the time-share unit, he did not own anything else.

¶41. Since December, 1995, Virgie had received approximately $4,500 from an asbestos claim Richard had filed regarding his work at the shipyard in Pascagoula, Mississippi. Virgie testified that she did "all of the work" to collect the money. Virgie also received $3,500, but it is unclear whether this was for her personal asbestos claim or Richard's claim.

¶42. John F. Montgomery, a certified fraud examiner and public accountant, testified as "an expert in determining financial worth in Chancery Court matters, including alimony and child support." Montgomery had studied the documents filed in discovery in this case. Montgomery thought that Richard's financial statements were incomplete. They did not contain information on employment taxes, unemployment insurance, or workers' compensation insurance. Montgomery stated: "I'm not accusing [Richard] of lying. I'm just saying that I find it hard to believe [the financial information provided by Richard]." Montgomery further stated that the "spasmodic" deposits in Richard's bank account indicated that Richard "must have had income that was not being deposited or funds available that were not being deposited."

¶43. Montgomery testified that there was nothing illegal about dealing in cash, and that many sole proprietors deal in cash. However, it is illegal to fail to file employment taxes, if you have employees; income tax returns, if you have income; and, sometimes, unemployment insurance records, depending on the number of employees. Montgomery further stated that the law on whether a worker is an employee or an independent contractor for tax purposes is "a very gray area". Montgomery did not know the classification Richard's employees.

¶44. According to Montgomery:

> . . . it takes money to live. And unless there is a source of income other than the business activity that I don't have any information on, it seems to me pretty obvious that the -- a loss year in the first year is going to require some money available from some source other than the business activity if the information on the tax return is correct. So one has to live, and nowadays it takes money to live or you've got to have a source of living in some manner.

¶45. Richard testified that he did not have any income, other than the tire shop. Richard denied that he had any hidden money. He stated that he lived by borrowing money from his friends. For example, he sometimes borrowed money from a close friend, Loren Gordon, who was a tire distributor. Richard estimated his monthly expenses at $930 and his monthly income at $800. However, Richard testified that he did not owe anyone any money at the time of the hearing.

¶46. Freddie Clark, the parties' 30-year-old son, testified that he was unmarried, and he lived next-door to Virgie in a mobile home. Freddie had worked for his father some. Richard usually had 5-9 employees. The first week Freddie was paid $600 cash. Thereafter, his weekly salary was $400 cash. Freddie testified that his cousin also made $400 per week; one employee made $300 per week; and, two of the other employees made $200 per week. Those were the only salaries Freddie knew. To the contrary, Richard testified that he never had more than 4 employees at one time, and that the men named by Freddie worked at different times for $250 per week.

¶47. Frankie Lee, the parties' nephew testified that he worked for Richard from July, 1994 to February, 1995. Frankie estimated that Richard had 6-7 employees. Frankie was paid $400 per week cash. Frankie

was fired because he closed the business on a Friday, when Richard was gone to see about getting a child into college.

## LEGAL ANALYSIS

¶48. The standard of review in cases such as this is well-settled:

> Our scope of review in domestic relations matters is limited by our familiar substantial evidence/manifest error rule. *Stevison v. Woods*, 560 So.2d 176, 180 (Miss.1990). "This Court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Bell v. Parker*, 563 So.2d 594, 596-97 (Miss.1990). *See also Ferguson v. Ferguson*, 639 So.2d 921 (Miss.1994); *Faries v. Faries*, 607 So.2d 1204, 1208 (Miss.1992). In other words, "[o]n appeal [we are] required to respect the findings of fact made by a chancellor supported by credible evidence and not manifestly wrong." *Newsom v. Newsom*, 557 So.2d 511, 514 (Miss.1990). *See also Dillon v. Dillon*, 498 So.2d 328, 329 (Miss.1986). This is particularly true in the areas of divorce, alimony and child support. *Tilley v. Tilley*, 610 So.2d 348, 351 (Miss.1992); *Nichols v. Tedder*, 547 So.2d 766, 781 (Miss.1989). The word "manifest", as defined in this context, means "unmistakable, clear, plain, or indisputable." *Black's Law Dictionary* 963 (6th ed.1990).

*Turpin v. Turpin*, 699 So. 2d 560, 564 (Miss. 1997) (quoting *Magee v. Magee*, 661 So. 2d 1117, 1122 (Miss. 1995)).

¶49. Richard raises two issues and Virgie raises one issue on cross-appeal to be considered under this standard:

### A. Whether the trial court erred in the amount of support to be paid on behalf of appellee and the parties minor children?

¶50. With regard to child support, the chancellor ultimately ordered Richard to pay $200 per month per minor child, plus one-half of any college expenses. Richard raises two arguments with regard to child support. First, Richard claims that the child support order (of $200 per month per minor child) exceeds the statutory guidelines set forth in Miss. Code Ann. § 43-19-101 (Supp. 1999).

¶51. That statute provides that, for three children, 22% of the adjusted gross income of the paying party "shall be a rebuttable presumption in all judicial or administrative proceedings regarding the awarding or modifying of child support awards in this state." See Miss Code Ann. § 43-19-101(1) (Supp. 1999). Furthermore, that 22% guideline applies "unless the judicial or administrative body awarding or modifying the child support award makes a written finding or specific finding on the record that the application of the guidelines would be unjust or inappropriate in a particular case as determined under the criteria specified in Section 43-19-103."[(10)] See Miss. Code Ann. § 43-19-101 (2) (Supp. 1999).

¶52. This Court has held that the guidelines "do not control per se the amount of an award of child support." *Clausel v. Clausel*, 714 So. 2d 265, 267 (Miss. 1998). That is, child support awards are still "a matter within the discretion of the chancellor and that determination will not be reversed unless the chancellor was manifestly wrong in his finding of fact or manifestly abused his discretion." *Id.* at 266.

¶53. Nonetheless, when a chancellor chooses not to follow the guidelines, this Court has enforced the

statutory requirement that the chancellor make an on-the-record determination that the guidelines do not apply. See *Id*. at 267; ***Brocato v. Brocato***, 731 So. 2d 1138, 1145 (Miss. 1999). In this case, Richard reported a gross income of $30,500 in 1996 and was ordered to pay a total of $600 per month in child support. Even if Richard's reported gross income were not adjusted for taxes, etc., as provided for in the statute, the $600 award would exceed the statutory guidelines. That is, the amount awarded was approximately 23.61% of the gross income reported in Richard's 1996 tax return.

¶54. However, "[t]his Court is charged with reviewing the entire record." ***Anderson v. Anderson***, 692 So. 2d 65, 71 (Miss. 1997). The chancellor found, based on expert testimony and Richard's own testimony, that Richard was hiding assets and income, in order to avoid financial responsibility to his children and his wife of 33 years. In fact, based solely on the testimony regarding the payment of Richard's employees, it was evident that Richard made more than he said he did (or he could not have paid his workers). Thus, applying the statutory guidelines to Richard's reported income would not be accurate in this case.

¶55. Furthermore, a deeper study of the record indicates that the chancellor was not intentionally deviating from the statutory guidelines. Rather, the chancellor was attempting to follow the statutory schedule for child support payments.

¶56. Moreover, the $600 monthly award would be correct, if Richard's adjusted gross income were $32,727.27. The record supports such an award. Also, at the motion for rehearing, the chancellor offered to re-evaluate the figures, if Richard would submit more complete financial data. Thus, any perceived inaccuracies in the calculation could have been corrected, if Richard had been more forthcoming about his actual income. For all these reasons, it appears that Richard's argument on this point is without merit.

¶57. In addition, Richard apparently takes issue with the court's order to pay one-half his children's college expenses, in addition to the $200 monthly support for each child. Furthermore, Richard's argument appears to contradict existing caselaw. See *Lawrence v. Lawrence*, 574 So. 2d 1376, 1382 (Miss. 1991) ("Though college expenses are not technically "child support", a parent may be ordered by the court to pay them. A parent may also be ordered to pay some portion of the resulting expenses of college, in addition just to tuition."). See also *Varner v. Varner*, 588 So. 2d 428, 435 (Miss. 1991) (". . . payments such as college tuition will seldom qualify [as offset for child support], as they do not diminish the child's need for food, clothing and shelter.").

¶58. Therefore, Richard's argument that he does not have the money to make the required payments is unsupported by the record. See ***Anderson***, 692 So. 2d at 72 ("Evidence that supports or reasonably tends to support the findings of fact below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's finding of fact, must be accepted.")

> **B. Whether, in making the division of marital assets, the trial court erred in failing to follow established guidelines and such divisions, failing to support its decision with correct finding of fact, and failing altogether to support its decision with conclusions of law to aid in this appellate review?**

¶59. The record reflects that the chancellor gave extensive consideration to all aspects of this case. However, Richard argues that the chancellor's findings of fact were "incomplete, in substantial error, and simply at odds with the evidence presented in the case . . . [and, the chancellor] failed altogether to make any Conclusions of Law for purposes of aiding this Appellate review."

¶60. Specifically, Richard argues that the chancellor erred in the following findings of fact:

(a) [that Richard] deserted the marriage without cause in or around September 1994; [11]

(b) [that Richard] deals predominantly in cash and other modes of payment lacking any audit trail and has refused and failed to provide sufficient information to establish his true financial condition and/or worth for purposes of determining alimony, child support, and equitable distribution of marital property in this cause and has contumaciously refused or failed to produce deeds and other documents responsive to [Virgie's] specific discovery requests. . .

(c) in or around 1994, during the marriage to [Virgie] and with funds available through the joint effort, skill and industry of [Virgie and Richard that Richard] established a business enterprise know [sic] as "J & R Tire Service" with two locations at (1) 7520 Chef Menteur Highway, New Orleans, Louisiana, and (2) 8733 South Claiborn, New Orleans, Louisiana, and employing up to eight (8) employees who are paid in cash in amounts ranging from Two Hundred Dollars ($200.00) to Five Hundred Dollars ($500.00) per week, and, in connection with this venture, did enter into an agreement styled "Bond For Deed" recorded by the Custodian of Notarial Records, Parish of Orleans, State of Louisiana, under which [Richard] is obligated to pay One Thousand Two-Hundred Fifty-Four Dollars and Fifty-Three Cents ($1,254.33) in monthly consecutive installments payable over twenty (20) years together with an additional annual payment of Five Thousand Dollars ($5,000.000) on August 1, 1995 and each consecutive year thereafter for twenty (20) years.

(d) [that Richard] together with an adult female known as Jeanette Magee, did on or about The 11th day of July, 1995 and during the marriage to [Virgie] and with funds available through the joint effort, skill and industry of [Virgie and Richard did] purchase and obtain real property within Hancock County, Mississippi, by deed recorded in Book BB123, Pages 117-118 for a price of Nine Thousand Dollars ($9,000.00), of which [Richard] conveyed his one-half interest to said Jeanette Magee on the 19th day of October, 1995 by deed recorded at Book BB127, Pages 765-66;

(e) [that Richard] personally built, during the marriage to [Virgie] and with funds available through joint effort, skill and industry of [Virgie and Richard], improvements on said property in Hancock County, Mississippi, in the form of a spacious two-story, four bedroom personal residence with Jacuzzi, chandeliers, and wrap-around stereo system, said improvements having a fair market value of approximately One Hundred and Twenty Thousand Dollars ($120,000.00), all of which said improvements and underlying real property were deeded on the 16th day of February, 1996, by deed recorded in Book BB133, Pages 9-10, by the adult female known as Jeanette Magee to Patrick Clark, a nephew of the Defendant, RICHARD J. CLARK, JR., who resides in another state;

**C. Whether the chancellor's initial judgment as to the amount of alimony, the percentage of college expenses, and the percentage of uninsured medical expenses should be reinstated because they were supported by substantial credible evidence and were neither manifestly wrong nor clearly erroneous under the applicable legal standard?**

¶61. Virgie argues on cross-appeal that the chancellor should not have amended the original judgment.[12] Basically, Virgie argues that Richard had no standing to ask the chancellor to reconsider the original ruling, because Richard did not "come with clean hands". (citing *Warner's Griffith, Mississippi Chancery Practice* (Rev. Ed.) § § 34, 43).

¶62. However, "a chancellor 'may adjust his awards to do equity, and has considerable latitude in doing so.'" *Tillman v. Tillman*, 716 So. 2d 1090, 1094 (Miss. 1998) (quoting *Johnson v. Johnson*, 650 So.2d 1281, 1287 (Miss. 1994)). Thus, given the deferential standard of review, and given the chancellor's obvious desire to be fair, it does not appear that the amendments were unsupported by the record. Rather, it appears that the chancellor was attempting to be fair to both parties, and, in doing so, determined that a reconsideration of some issues was warranted. "And, it must be remembered, the goal of the chancellor in a divorce case is to do equity." *Tillman*, 716 So. 2d at 1094.

## CONCLUSION

¶63. The parties in this case are primarily arguing that the evidence did not support the chancellor's ruling. However, the record indicates that the chancellor considered every aspect of this case and issued a detailed, eight-page judgment. The chancellor then re-examined the issues, upon Richard's motion for reconsideration. After this additional hearing and consideration, the chancellor amended the judgment "to meet the equities."

> The trial judge saw these witnesses testify. Not only did he have the benefit of their words, he alone among the judiciary observed their manner and demeanor. He was there on the scene. He smelled the smoke of battle. He sensed the interpersonal dynamics between the lawyers and the witnesses and himself. These are indispensable.

*Madden v. Rhodes*, 626 So. 2d 608 (Miss. 1993) (quoting *Culbreath v. Johnson*, 427 So. 2d 705, 708 (Miss. 1983)).

¶64. This case was rather involved, given the length of the marriage; Virgie's poor health; the existence of minor children (each of whom were either enrolled in, or soon to be enrolled in, college); and the fact that Richard was less than forthcoming with regard to income and assets. The chancellor attentively and painstakingly waded through all the testimonial and documentary evidence. The chancellor's ruling was supported by the evidence and was not in manifest error. Therefore, given the deferential standard of review, this case is affirmed on appeal and cross-appeal.

¶65. **DIRECT APPEAL: AFFIRMED. CROSS-APPEAL: AFFIRMED.**

**SULLIVAN, P.J., BANKS, SMITH, MILLS, WALLER AND COBB, JJ., CONCUR. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PITTMAN, P.J.**

McRAE, JUSTICE, DISSENTING:

¶66. One thing that is clear from reading the majority opinion is that not only was the lower court confused, but so are we. This Court cannot be expected to make a clear, concise decision based on what is before us. First of all, the chancellor failed apply the statutory guidelines found in Miss. Code Ann. § 43-19-101

(Supp. 1999) and (2) gave no reason for such failure except his obvious contempt of Mr. Clark for *allegedly* hiding assets; however, there is no record made of the amount or any assets proven that were hidden. Second, assets were divided which were clearly non-marital property as they were obtained following the couple's separation. This case should be sent back for further deliberation using the statutory guidelines and our criteria established in ***Brabham v. Brabham***[13] , 226 Miss. 165, 84 So.2d 147, 153 (1955), considering college tuition and expenses (child support), with directions and a clear understanding by the chancellor to give a detailed explanation of how he came up with the award.

¶67. In failing to set forth specific reasons for not following Miss. Code Ann. § 43-19-101 (1) and required by subsection 2, Judge Stewart refused to do what we have required so many other chancellors to do in the past. Pursuant to the statute, for three children, 22% of the adjusted gross income of the paying party is the maximum allowed.[14] This rule applies unless the judge makes a written finding that the application of the guidelines would be unjust. No specific writing was made except to allude to a suspicion of dishonesty on the part of Mr. Clark. There should be no exception made in this case.

¶68. The Majority itself has admitted that the $600 award exceeded statutory authority:

> Even if Richard's reported gross income were not adjusted for taxes, etc., as provided for in the statute, the $600 award would exceed the statutory guidelines. That is, the amount was approximately 23.61% of the gross income reported in Richard's 1996 tax return. (Opinion, page 18).

¶69. However, the Majority acquiesces in the chancellor's departure from the law by claiming that after reviewing the entire record, there was evidence that Mr. Clark was hiding assets and income; and thus applying the guidelines would not be accurate in this case. While the 23.61% factor is only in regard to the $600.00 amount, once that is coupled with the college expenses that he is ordered to pay Mr. Clark will be forced to pay well over the guideline maximum. Taking into account the amount Clark pays in college expenses, he is not merely paying 1-2% over the guideline maximum, but many times more.[15] The fact that a chancellor suspects that someone is hiding assets, but has no other proof, is not enough to depart from well-founded statutory guidelines. Such a holding would open the door to chancellors being able to discard the guidelines every time, and simply say the reason is "I suspect dishonesty."

¶70. Another assignment of error involved the distribution of what the court found to be marital assets. The chancellor in this case awarded Mrs. Clark assets which were acquired by Mr. Clark after their separation, namely assets derived from Mr. Clark's tire repair business. Considering the fact that the separation took place in July of 1993 and the tire business some time later, there is no reason to classify it as marital property based on our recent ruling in ***Godwin v Godwin***, No.97-CA-00380-SCT, slip op. at 2, 1999 WL 37456, at *2 (Miss. June 10, 1999).

¶71. In ***Godwin,*** this Court strengthened its stance on the distribution of property acquired after separation. In that case, a separate maintenance order was originally pursued and ordered. Both parties operated under this order for some time until the divorce was sought and granted. In dividing property pursuant to the divorce we did not allow any assets obtained after separation to be divided between the parties.[16] In the case sub judice, Virgie Clark filed for separate maintenance and later amended the complaint to include the alternative claim of divorce, which was granted. As a result, our holding as to division of property should be analogous to that in ***Godwin***.

¶72. In *Godwin* we held that assets acquired after an order for separate maintenance **should be considered the separate property of the parties, and could not be divided** absent a showing of either (1) contribution to the acquisition of the asset by the other spouse, *Magee v. Magee*, 661 So.2d 1117, 1123 (Miss.1995), *Ferguson v. Ferguson*, 639 So.2d 921, 928- 29 (Miss.1994) or, (2) acquisition of the asset through the use of marital property. Although neither of these factors existed, the chancellor divided non marital property acquired *after* the separation and this Court has affirmed. It seems that we ought to be consistent.

¶73. Mr. Clark has been ordered to pay a specific amount for child support which, when taking college expenses into account, is drastically over the statutory guidelines and the factors set out in *Brabham*. The chancellor has left us no true explanation as to why the guidelines were abandoned aside from his general distrust in Mr. Clark's disclosure of income. This case should be reversed and remanded. Therefore, I dissent.

## PITTMAN, P.J., JOINS THIS OPINION.

1. However, based on his claim that he left Virgie in July, 1993, Richard asserts that the subsequent purchases of the tire shop(s) and of the residential property in Hancock County could not have been a result of the parties' "joint effort, skill and industry."

Richard's argument ignores the fact that, during the separation, Virgie attended to the needs of Richard's minor children; handled the finances, repairs, and daily supervision of the marital home; and, paid the debt on the parties' time-share unit. All these efforts on Virgie's part enabled Richard to have the time, financial resources, and good credit to pursue other endeavors (such as a business and a new residence with another woman).

2. Dr. Roberts further stated that the office visits and blood tests for monitoring Virgie's condition were about $55-$60 per visit. If Virgie's condition were to worsen, she could have to come in twice per month. If Virgie were to have to monitor her glucose levels at home, that would cost about $100 per month.

3. [3]However, Richard's son, Freddie, testified that it stood for Jeanette and Richard. Freddie also stated that Richard and Jeanette had a personal relationship. Freddie did not know anything about their business relationship.

4. [4]The actual lease called for much higher rent payments ($1254.53), but Richard testified that he only paid about $350 rent each month, and that he had two other tenants on the property, who paid the balance of the rent. Virgie testified that she believed Richard owned the other businesses on the property. For example, one of the businesses was a washerette, and, in early 1994, Virgie saw Richard in the washerette office "selling stuff and giving change for the machines." Furthermore, Virgie stated that she went to the property on July 7, 1995, to get some money from Richard, and Richard told her that he bought the building. The building also had an apartment and a sandwich shop. Richard told Virgie that he received rent

money from those endeavors.

5. The chancellor was clearly skeptical of this arrangement, and, at trial, questioned Richard at length about the Hancock County home. Furthermore, the chancellor made the following comments at the hearing on Richard's motion to reconsider:

. . . I'd like to know how that house was built with no money. It was about -- gosh, it was a monstrous house. It looked like what we sell over here for about a quarter of a million . . . [Richard] was with a girlfriend, and it ended up in her name. And I believe it ended up in his -- finally ended up in his cousin's [sic] name, a dentist over there. And I asked what consideration passed there, and he said, "Oh, he came -- the dentist came over and helped him change tires on the weekend or after work. And I just found that totally incredible. I thought it was the worst story that I'd ever been jived with anywhere in the courtroom.

* * *

. . . it was just as if someone was saying to me, Judge Stewart, you are a turnip and you fell off that truck two weeks ago. And I want y'all to know I'm not a turnip. You know, I cannot accept a story about somebody just conjuring up -- He's got a girlfriend, got a house, and all this kind of stuff, and it just magically appeared there without income. I had a real hard time with that, I don't mind telling you.

* * *

I can't have someone building a house over here with a girlfriend and ending up in a dentist's name and then saying, well, [Richard] gave all of the information he had about financial information . . .

* * *

And when we got the picture of the house -- And it was a beautiful home. I'd love to live in it -- there was a big boat sitting out in the front yard. And [Richard] said it belonged to somebody else, and it was just sitting there in his yard. It's things like that.

6. Richard had also built a home for his daughter without charging her for his labor, and he helped her pay for the materials.

7. [7]Virgie and her son, Freddie, testified that Richard kept his money in suitcases, paper bags, his car trunk, his desk drawer, etc.

8. [8]This mobile home originally belonged to Virgie's mother. Richard and Virgie had allowed her mother to

live on their property in the mobile home for years. Virgie's mother gave the home to Virgie.

9. The record is a bit contradictory. Apparently, there was another boat parked in front of the Hancock County home. According to Richard, his nephew Patrick Clark was buying the boat from a man named Rodney Gillery.

10. The criteria to be considered under that section are:

(a) Extraordinary medical, psychological, educational or dental expenses.

(b) Independent income of the child.

(c) The payment of both child support and spousal support to the obligee.

(d) Seasonal variations in one or both parents' incomes or expenses.

(e) The age of the child, taking into account the greater needs of older children.

(f) Special needs that have traditionally been met within the family budget even though the fulfilling of those needs will cause the support to exceed the proposed guidelines.

(g) The particular shared parental arrangement, such as where the noncustodial parent spends a great deal of time with the children thereby reducing the financial expenditures incurred by the custodial parent, or the refusal of the noncustodial parent to become involved in the activities of the child, or giving due consideration to the custodial parent's homemaking services.

(h) Total available assets of the obligee, obligor and the child.

(i) Any other adjustment which is needed to achieve an equitable result which may include, but not be limited to, a reasonable and necessary existing expense or debt.

Miss. Code Ann. § 43-19-103 (1993).

11. Richard also argues that he does not have the money to pay for termite repairs and property taxes on the marital home, medical expenses, and attorney fees. Apparently, Richard is arguing that the evidence does not support these awards. This seems rather disingenuous, given the expert testimony and the chancellor's findings that Richard was intentionally hiding income and assets. This is particularly true, given that the chancellor reconsidered the matter and reduced the amount of medical payments owed, based on these same arguments by Richard.

12. Originally, the chancellor ruled that Richard should pay alimony in the amount of $500 per month, to be offset by Virgie's rental income from the parties' time-share unit and the mobile homes located on the property with the parties' marital home. After hearing the motion to reconsider, however, the chancellor specifically found that the reasonable rental income was $350 per month, and ordered Richard to pay $150 per month alimony. This seems logical, since Virgie was allowing family members to live in and/or rent the mobile homes.

In addition, the chancellor originally held that Richard should pay child support in the amount of $200 per month per minor child, unless the child was enrolled in college. In which case, Richard was ordered to pay

all college expenses (including tuition, books, housing, meals, and living expenses equivalent to the cost of attending a "state-supported university of Mississippi", until the parties' minor children reach the age of 21 or completed college study, whichever was later). However, after the hearing on Richard's motion to reconsider, the chancellor ordered that the college education expenses of the minor children be equally divided between the parties. Given the disparity in the incomes of the parties, the chancellor also held that Richard would not be relieved of his ($200 per child) monthly support obligation while the children were in college. This does not seem to be a significant change in the original judgment.

Furthermore, the chancellor initially ordered Richard to pay all uninsured medical expenses for Virgie and the three minor children. However, upon reconsideration, the chancellor held that Richard should only be responsible for one-half the medical expenses, not covered by insurance, for Virgie and the three minor children.

13. We have that in this jurisdiction the nine factors found in *Brabham* are to be used in conjunction with the statutory guidelines to establish the proper award of child support. *Draper v. Draper*, 658 So.2d 866, 869 (Miss.1995).

We established the following nine guiding factors in *Brabham* to aid in weighing the evidence to determine the proper award of child support:

> (1) the health of the husband and his earning capacity;
>
> (2) the health of the wife and her earning capacity;
>
> (3) the entire sources of income of both parties;
>
> (4) the reasonable needs of the wife;
>
> (5) the reasonable needs of the child;
>
> (6) the necessary living expenses of the husband;
>
> (7) the estimated amount of income taxes the respective parties must pay on their incomes;
>
> (8) the fact that the wife has the free use of the home, furnishings and automobile, and
>
> (9) such other facts and circumstances bearing on the subject that might be shown by the evidence.

14. 22% of the adjusted gross income of the paying party "shall be a rebuttable presumption in all judicial or administrative proceedings regarding the awarding or modifying of child support awards in this state." Miss. Code Ann. § 43-19-101 (1).

15. Mr. Clark was ordered to pay $600 per month child support, **half of all college expenses and half of the medical expenses not covered by insurance for his three children** and ex-wife. The child support alone surpass the guideline maximum of 22%, without consideration of the thousands of dollars which will surely be expended for college expenses.

16. In *Godwin*, this Court held that the separate maintenance order was the determinative point in respect to distribution of property. "Under the circumstances of this case, the order creates a point of demarcation

with respect to the parties and their estates." *Godwin*, No.97-CA-00380-SCT, slip op. at 2, 1999 WL 37456 at \*2 (Miss. June 10, 1999).