# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 2000-CA-00421-COA

**CRAIG A. SOUTHERLAND**                                                 **APPELLANT**

**v.**

**SUSAN DIANE SHOEMAKER SOUTHERLAND**                        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/10/2000 |
| TRIAL JUDGE: | HON. DENNIS M. BAKER |
| COURT FROM WHICH APPEALED: | PANOLA COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | DAVID L. WALKER |
| ATTORNEY FOR APPELLEE: | M. LEE GRAVES JR. |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | DIVORCE GRANTED ON GROUNDS OF ADULTERY, APPELLEE AWARDED LUMP SUM ALIMONY, CHILD SUPPORT AND ATTORNEY'S FEES |
| DISPOSITION: | AFFIRMED - 5/22/2001 |
| MOTION FOR REHEARING FILED: | 6/1/2001; denied 7/31/2001 |
| CERTIORARI FILED: | 8/13/2001; granted 10/18/2001 |
| MANDATE ISSUED: | |

BEFORE McMILLIN, C.J., PAYNE, AND LEE, JJ.

McMILLIN, C.J., FOR THE COURT:

¶1. Susan Southerland was granted a divorce from her husband of some twenty-four years, Craig Southerland, on the basis that he had embarked on a prolonged adulterous relationship with a young woman who had formerly lived in the Southerland home as a foster child. The chancellor, as a part of the judgment dissolving this long-term marriage, awarded Mrs. Southerland lump sum alimony in the amount of $50,000, payable in monthly installments of $1,500 each, without interest. Additionally, the chancellor ordered Mr. Southerland to pay periodic child support for the fourteen-year-old daughter of the parties at the rate of $1,000 per month.

¶2. Mr. Southerland has now appealed, claiming that the chancellor abused his discretion in awarding such a large sum of lump sum alimony and that the chancellor further erred in setting child support arbitrarily without explanation or justification as to the amount. We find no reversible error and affirm the chancellor's judgment.

## I.

### Lump Sum Alimony

¶3. At the time of the divorce, Mr. Southerland was working in Florida and reported net monthly income of $5,111. Mrs. Southerland was living in Mississippi and working at a bank where she earned net monthly wages of $1,150. The parties had not accumulated any appreciable assets during the course of their marriage. The chancellor observed that Mr. Southerland had expressed an intention to marry the young woman who had lived for a number of years in the Southerland home. With that in mind, the chancellor indicated his reluctance to award periodic alimony because of the restraint the award might have on Mrs. Southerland's ability to embark on a new life for herself. The chancellor determined that an award of lump sum alimony was more appropriate in the circumstances. The chancellor noted that Mrs. Southerland had abandoned her own career during the marriage to support Mr. Southerland in his studies for the ministry and that she had worked in a closely-held business started by Mr. Southerland after the parties had moved to Florida. Taking into account the rather marked disparity between the present incomes of the parties, the chancellor determined that a lump sum award of $50,000 was appropriate and ordered it to be paid in periodic monthly installments of $1,500 each.

¶4. In fashioning the financial aspects of the dissolution of a marriage, a chancellor enjoys wide discretion. *Tillman v. Tillman*, 716 So. 2d 1090 (¶19) (Miss. 1998) (citing *Johnson v. Johnson*, 650 So. 2d 1281, 1287 (Miss. 1994)). He may be reversed on appeal only if it appears that he abused that discretion. *Monroe v. Monroe*, 745 So. 2d 249 (¶13) (Miss. 1999). The chancellor in this case made specific reference to the four basic factors affecting an appropriate award of lump sum alimony as set out in *Cheatham v. Cheatham*, and analyzed the proof as it related to those factors. *Cheatham v. Cheatham*, 537 So. 2d 435, 438 (Miss. 1988). The *Cheatham* factors include:

> (1) Substantial contribution to the accumulation of wealth. In this case, there was no great accumulation of wealth; nevertheless, the principal focus of the parties' economic pursuits had been in the area of aviation-related activities in Florida. Though their own closely-held business had failed, their efforts had provided Mr. Southerland with the contacts and the experience that permitted him to find gainful employment in that industry at a substantial salary. Mrs. Southerland had, on the other hand, by mutual agreement of the parties, returned to a small town in Mississippi in part to provide a better moral climate for the daughter. This mutual decision necessarily had the effect of substantially decreasing Mrs. Southerland's future economic opportunities. The chancellor concluded - and we agree - that this factor weighed in favor of a substantial award of lump sum alimony.

> (2) A long marriage. This marriage lasted some twenty-four years and, but for Mr. Southerland's adulterous behavior under circumstances that must have been unusually hurtful to his wife, had every prospect of enduring further. Certainly, it would appear inequitable to permit Mr. Southerland to cut his former wife adrift with limited resources and substantially limited income-earning potential while he continued to enjoy a large income and a lifestyle that he had selected for himself to the detriment of his wife and child. Again, this factor seems to weigh heavily in favor of an award of alimony to Mrs. Southerland. The chancellor so found, and we cannot say that was an abuse of his discretion.

> (3) Separate income or estate. The parties were without separate estates of any significant value. The chancellor characterized Mrs. Southerland's separate income as "meager" when compared to Mr. Southerland's. Considering that Mr. Southerland's disposable monthly income was over three times that of Mrs. Southerland's, it is difficult to say that the chancellor abused his discretion in so finding and in concluding that this suggested the propriety of an award of alimony to somewhat equalize the post-divorce financial position of the parties.

(4) Financial security without alimony. As we have observed, the evidence showed that Mrs. Southerland was without any substantial assets and was limited in her ability to produce income to her earnings as a bank employee. When compared to Mr. Southerland's comparatively high income-earning abilities, it was not error for the chancellor to conclude that Mrs. Southerland would lack any real financial security if she were forced to rely on her employment earnings as her sole source of support.

¶5. Having applied the proper considerations as set out in *Cheatham v. Cheatham,* and taking into account the fact that Mr. Southerland enjoys a monthly take-home salary in excess of $5,000, we do not think that a lump sum award of $50,000 payable in monthly installments of $1,500 was so exorbitant as to constitute an abuse of the chancellor's discretion in such matters.

## II.

## Child Support

¶6. Mr. Southerland's net income for purposes of child support calculations appeared from the proof to be $5,111 per month, which translates to the annual sum of $61,332. The chancellor set child support at $1,000 per month. Mr. Southerland on appeal contends that this was error in that it exceeds the statutory guidelines for child support determination as found in Section 43-19-101 of the Mississippi Code. Under Section 43-19-101(1), there is a rebuttable presumption created that child support for one child should be fourteen percent of the obligor's adjusted gross income. Miss. Code Ann. § 43-19-101(1) (Rev. 2000). Applying the percentage to Mr. Southerland's income would indicate a rebuttable presumption that child support should have been set at $715.54. There is the additional consideration that, when the obligor's income subject to child support calculations exceeds $50,000 annually, the chancellor must make a separate determination as to whether a strict application of the guidelines is reasonable. Miss. Code Ann. § 43-19-101(4) (Rev. 2000).

¶7. After the chancellor had announced his decision as to the level of child support from the bench, counsel for Mr. Southerland raised the issue that the amount did not appear to conform to the percentage guidelines of the statute. The chancellor, in response, specifically mentioned the fact that, prior to the divorce proceeding, both parties had mutually agreed to enroll the child in a private school. It is clear from the record that the chancellor considered this an extraordinary expense not contemplated in the statutory guidelines. Evidence indicated that this tuition cost was in the range of $368 per month. We note, from our own calculations, that even if Mr. Southerland's adjusted gross income over the $50,000 per year benchmark of Section 43-19-101(4) is ignored, the statutory guidelines would indicate child support of $583 per month. When the extraordinary expense of private school tuition is added to that figure, the total comes to $951 per month. The chancellor's detailed analysis of the respective financial position of the parties demonstrated that Mr. Southerland was financially able to incur this added expense for the benefit of the child beyond that suggested by a strict application of the statutory percentage. It seems equally clear that, were Mrs. Southerland forced to pay these education costs out of a monthly stipend for child support of something in the range of $600 to $700, she would be hard-pressed to meet the normal expenses associated with raising a fourteen-year-old daughter. Section 43-19-103 permits variations from the presumptively-correct percentages upon consideration of, among other things, "[t]he age of the child, taking into account the greater needs of older children," as well as "[s]pecial needs that have traditionally been met within the family budget even though the fulfilling of those needs will cause the support to exceed the

proposed guidelines." Miss. Code Ann. § 43-19-103(e) and (f) (Rev. 2000).

¶8. Based on the foregoing considerations, we do not find the chancellor's variance from the statutory guidelines to be so stark as to give rise to a finding of abuse of discretion.

### III.

### Attorney's Fees and Expenses

¶9. Counsel for Mrs. Southerland testified that he had devoted approximately twenty hours to working on the case and that he had advanced necessary expenses of $332.40. Counsel requested a fee of $4,000, but the chancellor reduced that to $3,750 and ordered Mr. Southerland to pay that amount together with the expenses of $332.40. On appeal, Mr. Southerland urges that this award was error because Mrs. Southerland had not met the threshold of proof to show that she was unable to pay those fees from her own assets. The chancellor is vested with substantial discretion in awarding attorney's fees in domestic relations cases. *Creekmore v. Creekmore*, 651 So. 2d 513, 520 (Miss. 1995). Nevertheless, one necessary prerequisite for such an award is a determination that the party seeking such fees does not have the financial ability to pay the fees from her own resources. *Id.* In this case, the proof shows that Mrs. Southerland is employed at a job producing earnings that fall below her estimated monthly budgetary needs. She has no independent liquid assets; neither did she receive any property of any significance in the divorce that might be used to defray her attorney's fees. She has, in addition, assumed the sole responsibility for the support and maintenance of a fourteen-year-old daughter (subject to Mr. Southerland's contribution to support that, when costs of schooling are excluded, comes to less than $600 per month). It is evident from the proof that Mrs. Southerland could not pay attorney's fees approaching some $4,000 without making significant and prolonged inroads into her already marginal financial stability. On the other hand, Mr. Southerland, having legal responsibility for only himself, will continue to have available to him disposable income of $2,600, which should prove adequate to permit him to live in a reasonably comfortable manner. To the extent that payment of Mrs. Southerland's attorney's fees adversely impacts on his financial situation temporarily, we conclude that it would be more equitable to visit that hardship on him in the context of the facts of this case than to saddle Mrs. Southerland with responsibility for the debt. We, therefore, decline to disturb the chancellor's award.

¶10. In keeping with such precedent as appears in *Creekmore v. Creekmore*, we also assess Mr. Southerland with $1,875 in attorney's fees to defray the cost of Mrs. Southerland's representation in this appeal. *Creekmore*, 651 So. 2d at 520.

¶11. **THE JUDGMENT OF THE CHANCERY COURT OF PANOLA COUNTY IS AFFIRMED. APPELLANT IS ASSESSED WITH ADDITIONAL ATTORNEY'S FEES OF $1, 875 FOR REPRESENTATION IN THIS APPEAL. COSTS OF THE APPEAL ARE ASSESSED TO THE APPELLANT.**

> **KING AND SOUTHWICK, P.JJ., PAYNE, THOMAS, LEE, MYERS AND CHANDLER, JJ., CONCUR. BRIDGES, J., CONCURS IN PART AND DISSENTS IN PART, JOINED BY IRVING, J.**

> BRIDGES, .J., CONCURRING IN PART, DISSENTING IN PART:

¶12. According to the Mississippi Supreme Court in *Overstreet v. Overstreet*, 692 So. 2d 88, 93 (Miss.

1997), the spouse requesting an award of payment of his or her attorneys' fees must show positive evidence of his or her own inability to pay. *See also Austin v. Austin*, 766 So. 2d 86 (¶ 15) (Miss. Ct. App. 2000); *Magee v. Magee*, 754 So. 2d 1275 (¶ 13) (Miss. Ct. App. 1999); *Bredemeier v. Jackson*, 689 So. 2d 770, 778 (Miss. 1997); *Smith v. Smith*, 614 So. 2d 394, 398 (Miss. 1993); *Martin v. Martin*, 566 So. 2d 704, 707 (Miss. 1990). I concur with the majority's opinion that Susan Southerland made a sufficient showing that she was unable to pay her attorney for his services connected with this divorce. She submitted thorough evidence of her financial situation through detailed itemization of her monthly expenses contrasted with her current monthly salary. I agree with the majority that the chancellor appropriately found that, based on these numbers and Susan's testimony, along with the testimony of her attorney, she sufficiently established her inability to pay the $4082.40 in accumulated attorneys' fees.

¶13. No error may be found by this Court regarding the chancellor's award of attorneys' fees to a party where there is evidence of that party's inability to pay through proof of income and financial status. *Austin*, 766 So. 2d at (¶ 15). As such, I would not reverse and remand this case on this point alone. However, I would like to point out that the case law also provides that the chancellor should record specific findings of these matters, giving his reasoning as to why he granted the award of attorneys' fees. *Bullock v. Bullock*, 733 So. 2d 292 (¶ 54) (Miss. Ct. App. 1998); *McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982). The Mississippi Supreme Court in *McKee*, pronounced that:

> [I]n addition to the relative financial ability of the parties, [the chancellor is to consider] the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case.
>
> * * *
>
> [T]he allowance of attorney fees . . . must be fair and just to all concerned after it has been determined that the legal work being compensated was reasonably required and necessary.

*McKee*, 418 So. 2d at 767. *See Bullock*, 733 So. 2d at (¶ 54).

¶14. In my opinion, the chancellor did not make findings on any of these things. He simply granted the amount that Susan was asking in attorneys' fees with no further specificity noted on the record regarding his reasoning and his findings on the legitimacy of the fees, the work done to acquire those fees, Susan's financial hardships, etc. I am convinced that, while the law does not permit this Court to overturn an award of attorneys' fees unless a proper showing of inability to pay has not been made by the party requesting the award, it is necessary for the chancellor to make specific findings and give specific reasoning for his decision. As I have stated before in my assessment of the Mississippi Supreme Court decision in *Sobieske v. Preslar*, 755 So. 2d 410 (Miss. 2000), regarding the need for specificity in findings dealing with child custody, I believe that chancellors should be and have been in the past, required to make specific findings when ruling on matters that are domestic in nature because of the sensitivity of the issues sometimes discussed in those cases. In family law issues such as divorce, child custody and child support, the courts are delving into very personal and guarded matters that should be dealt with in the most tactful manner. Further, because of the personal and delicate nature of these types of cases, the chancellor owes the parties as much as he can give them in the way of explaining his decision, a decision that will most times affect the lives of everyone involved.

¶15. I hold true to my position that the chancellor must not take these matters lightly. Findings in domestic matters, no matter what they be, should be discussed in a very definite and detailed fashion for the utmost benefit of all parties and participants. The Mississippi Supreme Court has said as much in cases such as *Ferguson v. Ferguson*, 639 So. 2d 921 (Miss. 1994), *Brabham v. Brabham*, 226 Miss. 165, 84 So. 2d 147 (1955) (both speaking about the specificity of findings on issues dealing with alimony), *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983) (speaking about the specificity required in issues dealing with child custody) and *Brocato v. Brocato*, 731 So. 2d 1138 (Miss. 1999) (echoing the mandate by Miss. Code Ann. § 43-19-103 (Rev. 2000) that the chancellor must make specific findings on the record on the issue of awarding child support above the statutory guidelines).

¶16. It stands to reason that the chancellor should then make these type of specific findings on any and all matters related to issues involving divorce and children, despite the connotation in *Sobieske* that this Court may sometimes *assume* that the chancellor made appropriate findings in certain cases without specific reasoning provided. *Sobieske*, 755 So. 2d at 411-12. If *Sobieske* purports to overrule these other cases requiring a chancellor to make detailed findings in the area of family law and allowing reviewing courts to simply *presume* that the chancellor made those findings even if they are absent from the record, then I was not made aware of such. If those were the court's intentions, it is my opinion that those intentions should be unequivocally announced to all chancellors and this Court without any ambiguity. Otherwise, I opine that specific findings by a chancellor must always be required in cases involving the dissolution of marriages, awards granted in those dissolutions and issues regarding the children who are the ultimate victims of these tragic cases.

¶17. As to the issue of child support, I respectfully dissent to the opinion of my colleagues in the majority. The majority finds that the chancellor made sufficient findings on the record with regard to his reasoning for his award of child support over the amount specified in Miss. Code Ann. § 43-19-101 (Rev. 2000). I disagree.

¶18. In *Brocato v. Brocato*, the Mississippi Supreme Court recognized the Mississippi statutory provision on child support guidelines which reads:

> The guidelines provided for in subsection (1) of this section apply unless the judicial or administrative body awarding or modifying the child support award makes a *written finding or specific finding* on the record that the application of the guidelines would be unjust or inappropriate in a particular case as determined under the criteria specified in Section 43-19-103.

*Brocato*, 731 So. 2d at 1144 (quoting Miss. Code Ann. § 43-19-101 (Rev. 2000)) (emphasis added). *See also Clark v. Clark*, 754 So. 2d 450, 459 (Miss. 1999); *Selman v. Selman*, 722 So. 2d 547, 554-55 (Miss. 1998); *Rakestraw v. Rakestraw*, 717 So. 2d 1284 (¶ 13-15) (Miss. Ct. App. 1998); *White v. White*, 722 So. 2d 731 (¶ 23-24) (Miss. Ct. App. 1998). I find that the chancellor made no such written or specific findings explaining his reasoning for going above the statutory guidelines. While the majority alludes to the fact that the chancellor commented on the expense of the Southerland's minor child continuing to attend private school, I am not convinced that the chancellor made it clear that this was his basis for increasing the amount of child support that Craig is to pay to Susan for their minor daughter. Those words were never said and recorded, least of all with any specificity. In my opinion, he seemed to only mention this issue of paying for private schooling in passing conversation.

¶19. However, even if the chancellor had given this as his reason for increasing the child support above the statutory amount, I would not agree that this alone would justify such an increase. The child had already been attending private school prior to the Southerland's divorce and, as such, the Southerlands had previously been paying this tuition out of their regular salaries. It is my opinion that Susan should not then be awarded supplementary child support for tuition that was not an "added" expense to her after the divorce. Had the child been in the public school system or some other school system before the divorce and then Susan opted to send the child to private school after her divorce from Craig, because it was in the child's best interest, I might see it a little differently. But, as it stands, I find that the expense of private school tuition for this minor child is an expense that was already factored into the Southerlands' monthly bills during their marriage and therefore should not have been considered by the chancellor as a reason for increasing the amount of child support Craig is to pay.

¶20. I have thoroughly combed the record and found nothing that satisfies me that the chancellor made the specific written findings required of him regarding the amount of child support ordered here. As such, I would remand this issue to the lower court for more specific findings on the chancellor's deviations from our settled statutory guidelines.

¶21. Even with my opinion here being noted, I would like to clarify that I, in no way, agree with or ignore what Craig Southerland has done here. I find his actions despicable and abhorrent, but I cannot in good conscience, let my thoughts about his immoral deeds control my assessment of the law in this matter. I would plead with this chancellor and all others in the future to clarify, with detail, their decisions affecting divorcing parties and their children and take these very fragile matters more to heart.

**IRVING, J., JOINS THIS SEPARATE OPINION.**