# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-CT-00974-SCT

*RICHARD BRODERICK JONES*

*v.*

*NEVADA RAE BARR JONES*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 01/25/2006 |
| TRIAL JUDGE: | HON. STUART ROBINSON |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | MARK A. CHINN |
| | WILLIAM MATTHEW THOMPSON |
| ATTORNEYS FOR APPELLEE: | MICHAEL J. MALOUF |
| | MELISSA ANN MALOUF |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED IN PART AND REVERSED IN PART. THE JUDGMENT OF THE CHANCERY COURT OF HINDS COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART. - 11/20/2008. |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**DIAZ, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     After agreeing to a divorce on the ground of irreconcilable differences, Nevada Rae

Barr Jones and Richard Broderick Jones permitted the Hinds County Chancery Court to

decide the issues upon which they could not agree, *inter alia*, the equitable distribution of the

marital assets. In his final judgment, the chancellor awarded Nevada approximately seventy-eight percent of the marital assets, leaving Richard with the remaining twenty-two percent. Aggrieved by, among other things, the chancellor's distribution of the marital assets and failure to sanction Nevada for several discovery violations, Richard appealed the chancellor's final judgment. We assigned the case to the Court of Appeals, which affirmed the judgment of the chancery court; three judges dissented. *Jones v. Jones*, 2007 Miss. App. LEXIS 846, at *16 (Dec. 11, 2007). Richard filed a petition for writ of certiorari, which we granted. Finding error, we remand the case for further proceedings consistent with this opinion.

### Facts and Proceedings Below

¶2.     Nevada Barr and Richard Jones were married on June 29, 1996, in Clinton, Mississippi. In 1997, Nevada separated from Richard and subsequently filed for divorce on the ground of habitual cruel and inhuman treatment. Eight months later they reconciled, and Nevada dismissed her complaint for divorce. In 2004, the couple again began experiencing domestic difficulties. On November 30, 2004, Nevada abandoned the marital home and left a "Dear John" letter explaining the reasons for her departure. After the couple was unsuccessful at mediating a divorce settlement, Nevada filed a complaint for divorce on December 23, 2004, asserting that she was entitled to a divorce on the ground of habitual cruel and inhuman treatment or, alternatively, on the ground of irreconcilable differences.

¶3.     On March 16, 2005, Richard filed his answer and a counterclaim for divorce on the ground of adultery or, alternatively, on the ground of irreconcilable differences. Subsequently, Nevada and Richard filed a joint motion for divorce based on irreconcilable differences, in which they agreed to allow the chancery court to decide the following issues:

2

asset valuation, distribution of marital property and debts, alimony, taxes, and the assessment of attorney's fees and court costs.

¶4.     On October 24, 2005, Richard filed a motion for sanctions.  He requested that the court "strike any reference to or proof by Nevada at the trial of this matter concerning her allegations of fault against [him]" and to award him "reasonable attorneys fees, costs, and expenses incurred in pursuing this matter."  The basis for this motion was that Nevada had committed several acts of perjury during a deposition conducted on March 8, 2005.

¶5.     During that deposition, Nevada, when questioned about whether she had had sexual intercourse with anyone other than Richard during their marriage, stated, "The entire time I have been with Richard, I didn't even hold hands, kiss, flirt, or receive dirty e-mails from other men."  She was then asked about whether she had spent the night at the house of a man named Donald Paxton with whom it was suspected she had entered into an extramarital relationship.  She explicitly denied having stayed the night at his house:

> [Counsel for Richard]: Have you stayed the night at Don's house?
>
> [Nevada]: No.
>
> Q: You nodded yes and said no? [sic]
>
> A: No, I shook my head.

Moments later, however, Nevada admitted that she had lied about not spending the night at Paxton's house:

> Q: You know a second ago I asked you, "Did you stay the night or anything like that," [sic] and you answered, "I don't think I stayed that night, no."
>
> A: I've stayed the night there.

3

Q: Oh, you have stayed the night there?

A: Uh-huh (affirmatively).

. . .

Q: All right. So what you're admitting now is that you did lie a minute ago when you said –

A: I did.

Q: Excuse me, let me finish. A minute ago when you said -- I asked you, "Have you stayed the night at Don's house," [sic] and you answered, "No." That was a lie?

A: That was a big, fat lie.

¶6. She then admitted to having lied about not having had sexual intercourse with a man other than Richard:

Q: Since you left Richard, you have held hands, kissed, and had sexual intercourse with someone other than Richard? [sic]

A: Yes, I have.

Q: Who was that?

A: That would be Don Paxton.

The following exchange also took place:

Q: So you're telling me that the only man that you've had sexual intercourse with since the date you married Richard is Donald Paxton?

A: Yes.

Q: Is that the truth?

A: Yes. You can see my career at lying was pretty short lived.

Q: All right. Do you understand this is under oath and if you're lying, it's a crime?

4

A: I do.  And I was going to try and commit the crime and I just can't do it.

Nevada also testified as follows: "I was tempted to lie because I wanted to better my position, but I can't do it so I'm telling you the truth."

¶7.    When Richard's counsel inquired as to when her sexual relationship with Paxton began, she replied, "Late January, early February."  This statement was revealed to be false when Paxton testified via deposition that they had first had sex in November 2004:

> Q: And as you recall this dinner at the Parker House took place in the first part, perhaps the mid part of November?
>
> A: That's correct.
>
> Q: What was you next communication with Nevada?
>
> A: She called me up, said she'd like to come up. She came up and we had sex.
>
> Q: Do you recall when that was?
>
> A: That was the next day.
>
> Q: The next day?
>
> A: Yeah.
>
> Q: Would that have been either in the early part or mid part of November, 2004?
>
> A: That would be correct, yes.

Paxton also testified that Nevada had told him that she had lied in her March 8 deposition about  when their sexual relationship began:

> Q: Okay. So it's not true, is it, that the first time you and Nevada kissed was in sometime at the end of January, first of February, 2005?

5

A: We had a relationship in January. And I do recall her having told me that that's what she told you about the first time we had relationships. And I also know that you, just statement of fact, had intimidated or scared her. And she was, I believe, simply trying to protect me in what she was doing.[1]

Q: So Nevada has told you that she lied in her deposition?

A: Nevada told me that she recalled at that point that that's what she had said.

¶8.     Richard subsequently filed a second motion for sanctions.  In that motion,  Richard argued that Nevada should be sanctioned for having destroyed her personal computer soon after her deposition on March 8.  At that deposition, Nevada testified that she had typed the "Dear John" letter on her personal computer and that she still possessed that computer.  On March 15, Richard propounded his second request for production of documents in which he sought production of her personal computer.  On March 31, Nevada filed her responses to Richard's requests for production of documents; she objected to his request that she produce her personal computer as being "overly broad and outside the scope of discovery."  Richard then filed a motion to compel in which he sought, among other things, the production of Nevada's personal computer.  Nevada's supplemental response to this request stated, "Plaintiff no longer has a computer inasmuch as her computer was destroyed by her prior to

---

[1]Nevada claims that she was afraid that if her relationship with Paxton was revealed, he would be forced to resign his job.  She testified about this fear as follows:

At that time, my lawyer, who is a wonderful woman, she told me that [Richard's attorney] was a ruthless person and that if he knew about Mr. Paxton, he would go after Mr. Paxton with specious lawsuits and he would ask him to produce his computer from his place of business, and Mr. Paxton's position is politically sensitive, and this man would have had to resign if that happened. And I believed her, and so when the question came up, I lied, I perjured myself. I knew I was doing it; I knew it was a crime. I did it anyway because I didn't want an innocent man to suffer, and so I made a botch of it, as [Richard's attorney] has pointed out.

6

Defendant's request." Nevada later testified about what she did with her personal computer: "I took a cold chisel and a hatchet; I tore it apart; I then took all of the pieces that were inside of it and I put them in the metal box; I burned it by pouring gasoline over it, and I shoveled it into a plastic bag and I dumped it in a bayou."

¶9.    A hearing was held immediately prior to trial on Richard's motions for sanctions. At the conclusion of the hearing, the chancellor stated the following:

> Admittedly by the witness, there's been a tremendous amount of perjury committed in this case, over and over again, several times after she stated that she would no longer do that and so forth, then continued to do that. I think that it's certainly subject to sanctions because of that. I mean, sanctions is the least of it, really, for this kind of perjury, but I'm going to declare that she has committed perjury and is going to be sanctioned, and I'll take it under advisement as to what the sanctions will be.

However, the chancellor never imposed sanctions against Nevada. Neither the chancellor's post-trial order containing his ruling on the distribution of marital assets, nor the final judgment incorporating that order, mention sanctions.

¶10.    A two-day trial was then conducted. Following the trial, the chancellor issued his ruling on the distribution of the marital assets. The chancellor awarded Richard approximately twenty-two percent of the marital assets. He awarded Richard the marital home in Clinton (equity of $190,000); the home he purchased in West Virginia shortly after the parties separated in 2004 (equity of $19,500); the three automobiles, motorcycle, and yard equipment in his possession (collectively worth $12,935); an investment account worth $77; two IRAs worth $17,935; two checking accounts containing a total of $5,200; a retirement account with an approximate value of $280,737; and an annuity account with an approximate value of $112,024. The chancellor awarded Nevada the residence she

7

purchased in New Orleans after the parties separated in 2004 (equity of $360,000), three automobiles and two scooters collectively worth $40,950, the Merrill Lynch brokerage account worth $1,435,257, and all future income derived from the books written by her during the marriage. The chancellor found that Nevada was scheduled to receive $254,400 (after deductions for a fifteen percent commission and a thirty-two percent tax liability) for books written during the marriage.

¶11. The chancellor ruled that Richard would be responsible for the following liabilities: $70,000 in credit card debt in his name, the $61,000 mortgage on the home he purchased in West Virginia, and the $16,500 still owed on the 2002 Honda S200 in his possession. Nevada was held to be responsible for the $3,000 owed for property taxes on the marital residence. The chancellor further ruled that neither party was entitled to alimony or attorney's fees. On January 25, 2006, the chancellor entered a final judgment granting the parties a divorce and dividing the marital assets in accordance with his previous ruling.

## Issues

¶12. This Court granted Richard's petition for certiorari to review the following assignments of error: (1) the chancellor erred in denying his motion for sanctions; (2) the chancellor erred in relying on Nevada's perjurious statements and destruction of evidence; and (3) the chancellor did not equitably distribute the marital assets.

## ANALYSIS

### I. Motions for Sanctions

¶13. This Court reviews a trial court's decision about whether to impose sanctions for discovery abuses under an abuse-of-discretion standard. *Tinnon v. Martin*, 716 So. 2d 604,

8

611 (Miss. 1998) (citation omitted). "The provisions for imposing sanctions are designed to give [trial] court[s] great latitude." *Amiker v. Drugs for Less, Inc.*, 796 So. 2d 942, 948 (Miss. 2000). We will affirm a trial court's decision unless we have a "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors." *Cooper v. State Farm Fire & Cas. Co.*, 568 So. 2d 687, 692 (Miss. 1990).

¶14. Mississippi Rule of Civil Procedure 37(c) provides in relevant part that a "court may impose upon any party . . . such sanctions as may be just, . . . if any party . . . abuses the discovery process in seeking, making, or resisting discovery." Miss. R. Civ. P. 37(c). It is beyond dispute that Nevada abused the discovery process by resisting discovery. She resisted discovery by admittedly lying under oath about staying the night at Paxton's house and having sexual intercourse with Paxton. She resisted discovery also by lying under oath about when her sexual relationship with Paxton commenced and intentionally destroying her personal computer immediately after her March 8 deposition. The question is whether the chancellor abused his discretion by not imposing sanctions against Nevada for her admitted perjury and destruction of evidence.

¶15. In *Pierce v. Heritage Properties, Inc.*, 688 So. 2d 1385 (Miss. 1997), this Court held that the circuit court did not abuse its discretion by dismissing the plaintiff's suit with prejudice based on the plaintiff's filing untrue responses to discovery requests and providing false deposition testimony. *Id.* at 1390, 1392. We stated that "[s]uch action by any party should not and will not be tolerated." *Id.* at 1392. We also declared that there is no

9

requirement that the party moving for sanctions be substantially prejudiced by the opposing party's discovery violations in order for sanctions to be warranted. *Id.* at 1391.

¶16. Similarly, in *Scoggins v. Ellzey Beverages, Inc.*, 743 So. 2d 990 (Miss. 1999), this Court affirmed the circuit court's dismissal of a plaintiff's case with prejudice because the plaintiff knowingly submitted false answers to interrogatories and perjured herself during a deposition. *Id.* at 997.

> "A trial is a proceeding designed to be a search for the truth." *Sims v. ANR Freight Systems, Inc.*, 77 F.3d 846, 849 (5th Cir. 1996). When a party attempts to thwart such a search, the courts are obligated to ensure that such efforts are not only cut short, but that the penalty will be sufficiently severe to dissuade others from following suit. For these reasons set out above, this Court finds that dismissal with prejudice is the only penalty that will accomplish that purpose on the facts as presented.

*Id.* at 994-95.

¶17. Our Court of Appeals found that the circuit court abused its discretion by not imposing sanctions against a plaintiff who committed perjury at trial and made false statements to her expert witness about her psychological condition.[2] *Gilbert v. Ireland*, 949 So. 2d 784, 790 (Miss. 2006). In fact, the court concluded that the only appropriate sanction for the plaintiff's misconduct was dismissal of her suit. *Id.* at 792.

¶18. Having examined the record and having reviewed our case law, we agree with the dissenting judges below that Nevada's misconduct must "not go unpunished." *Jones*, 2007

---

[2]The plaintiff lied about losing her sex drive and her academic performance being impaired as a result of a car accident. *Id.* at 787. Her perjury forced the circuit court to declare a mistrial. *Id.* The circuit court did sanction the plaintiff by ruling that at the third trial she could not pursue her loss-of-sex-drive claim or her claim for diminished academic performance, but, as the Court of Appeals pointed out, this ruling was meaningless, because it meant only that "she could not give false testimony a third time." *Id.* at 789.

Miss. App. LEXIS 846 at *21. As we previously have stated, such attempts to subvert the judicial process will not be tolerated. *Pierce*, 688 So. 2d at 1392. When faced with such egregious misconduct, courts are obligated to consider sanctions that are severe enough to deter others from pursuing similar courses of action. The chancellor in this case did not satisfy that obligation and abused his discretion by not addressing Nevada's misconduct. Accordingly, the chancellor, on remand, must consider imposition of sanctions and/or a referral to the district attorney to consider criminal prosecution for perjury and destruction of evidence.

## II. The Chancellor's Reliance on Nevada's Perjurous Statements and Destruction of Evidence

## and

## III. Equitable Distribution

¶19. Because Richard's second and third assignments of error are related, they will be addressed together. "Our scope of review in domestic relations matters is limited by our familiar substantial evidence/manifest error rule." *Clark v. Clark*, 754 So. 2d 450, 458 (Miss. 1999) (citation omitted). "The equitable distribution of marital assets is committed to the discretion of the chancellor, whose findings will not be disturbed by this Court unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Arthur v. Arthur*, 691 So. 2d 997, 1003 (Miss. 1997) (citation omitted).

¶20. Richard argues that the chancellor's distribution of the marital assets was not equitable. Specifically, he contends that (1) the chancellor gave short shrift to his contributions to the acquisition of marital assets and (2) the chancellor erred by not awarding

11

him any interest in the future income earned from the books written by Nevada during the marriage.

¶21.    In ***Ferguson v. Ferguson***, 639 So. 2d 921, 928 (Miss. 1994), this Court adopted the following set of factors for chancellors to consider in deciding how to distribute the marital assets:

> 1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
>
>> a. Direct or indirect economic contribution to the acquisition of the property;
>>
>> b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
>>
>> c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
>
> 2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.
>
> 3. The market value and the emotional value of the assets subject to distribution.
>
> 4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
>
> 5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
>
> 6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;

7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,

8. Any other factor which in equity should be considered.

*Id.* at 928.

### 1. Substantial contribution to the accumulation of property.

#### a. Economic Contribution.

¶22. The chancellor found that Nevada earned approximately ninety-six percent of the couple's income during the marriage and that Richard quit his job because Nevada was earning such a substantial amount. Further, the chancellor found that Richard's contribution to the couple's acquisition of property consisted of making significant improvements to the marital home, cooking most of the evening meals, answering emails from Nevada's fans, occasionally making travel arrangements for Nevada, and accompanying her on book tours. But the chancellor went on to find that Richard did not directly or indirectly contribute to Nevada's success as an author and that his "domestic contributions to the marriage were of limited amount and limited significance." The chancellor concluded that "Richard made very limited contribution [sic] to the acquisition of property."

#### b. Contribution to the stability and harmony of the marriage.

¶23. The chancellor found that neither party substantially contributed to the stability or harmony of the marriage. He noted that Richard was "addicted to pornography" and "exchanged sexually explicit e-mails with other women." He also acknowledged that Nevada "was not without fault during the marriage." He further noted that the marriage

13

lasted a little over eight years, but that the parties were separated for an eight-month period during 1997 and 1998.

### c. Contribution to the education, training, or other accomplishment.

¶24. During the couple's marriage, Nevada's annual income increased from $32,791 to $991,987, and she wrote her two most successful novels – *Blood Lure* and *Hunting Season*. Richard argues that during the periods of time when Nevada was writing, Richard contributed to her accomplishments by: making sure that she was not bothered by anyone; answering e-mails from her fans on a regular basis; accompanying her on book tours; helping her deal with members of the public on the tours; and handling most of the couple's financial matters.

¶25. However, the chancellor stated, "Nevada enjoyed great success as an author before the marriage and the minor 'assistance' provided by Richard throughout the marriage does not rise to the level of any contribution." The chancellor found that neither party made a contribution to the other's education, training, or other accomplishment.

### 2. Degree to which spouses disposed of assets.

¶26. The chancellor found that Richard spent a considerable amount of money on his three adult children from two previous marriages. He and Nevada loaned approximately $50,000 to one of his children to start a business in Norway, and they paid for three years of out-of-state college tuition for another child. The chancellor noted that Nevada did not mind paying for the one child's college tuition. The chancellor also found that Richard spent considerably more on "travel, entertainment, and personal pursuits" than Nevada.

### 3. The market value and the emotional value of assets subject to distribution.

14

¶27. The chancellor's determination of the market value of the assets is set out above in the factual summary of the case. The chancellor found that Richard was more emotionally attached to the marital home and the home he purchased in West Virginia after the parties separated, and that Nevada was more emotionally attached to the residence in New Orleans.

**4. Value of assets not ordinarily subject to distribution.**

¶28. The chancellor found that during the marriage Nevada received $691,000 from books written prior to the marriage, but that this income was commingled and thus became marital property.

**5. Tax and other economic consequences of distribution.**

¶29. No evidence was presented at trial regarding any tax or economic consequences of the distribution.

**6. Extent to which property division can eliminate the need for alimony.**

¶30. The chancellor determined that a proper division of the property would eliminate the need for alimony.

**7. Needs of the parties for financial security.**

¶31. The chancellor found that Nevada would be financially secure after the divorce because of her tremendous earning capacity as a successful author. With regard to Richard, the chancellor made the following findings:

> Richard is 55 years old and is in good health. He has a Bachelor's degree in business and finance. As presented at trial, Richard has many and varied talent [sic] and experience, including working for the National Park Service. He has a federal employee rating of GS11 and is eligible for re-employment with the federal government. Further, Richard has an annual retirement pension of $15,000 for life, as well as health insurance. . . . Richard has the capacity to

15

earn a substantial income and has shown no need for additional income from Nevada.

**8. Other factors which in equity should be considered.**

¶32.    The chancellor did not consider any other factor, but did state in conclusion that "[t]he evidence clearly supports a division of marital assets which significantly favors Nevada." The chancellor reached this conclusion based on the fact that "Richard contributed very little to the accumulation of assets, spent large amounts of money solely for his entertainment and pleasure, refused to seek gainful employment even after the parties' separation, and had an addiction which led to a strain on the marital relationship." The chancellor ~~did~~ acknowledged Nevada's discovery violations, but determined that they should not have any bearing on the distribution of marital assets: "The Court is well aware that Nevada does not come to the Court with clean hands; however, in considering the *Ferguson* factors, it is clear that Nevada should receive a much larger amount of the marital assets."

¶33.    We have held that there is no requirement that the chancellor divide the marital assets equally between the divorcing parties. *Love v. Love*, 687 So. 2d 1229, 1232 (Miss. 1995) (citations omitted). In addition, we grant chancellors wide discretion when dividing marital property. *Bullock v. Bullock*, 699 So. 2d 1205, 1211 (Miss. 1997). Because we cannot say that the judgment was "manifestly wrong or unsupported by substantial, credible evidence," we find that the chancellor did not abuse his discretion, and this assignment of error is without merit.

<u>CONCLUSION</u>

¶34.    For the foregoing reasons, we affirm in part and reverse in part the Court of Appeals'

16

judgment, and we affirm the chancery court's judgment in part, reverse it in part, and remand the case to the chancery court with instructions to consider the imposition of sanctions and/or a referral to the district attorney to consider criminal prosecution for perjury and destruction of evidence.

¶35. **THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED IN PART AND REVERSED IN PART. THE JUDGMENT OF THE CHANCERY COURT OF HINDS COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.**

**SMITH, C.J., CARLSON, DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. WALLER, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, J.**

**WALLER, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶36. I believe no error was committed by the chancellor in denying sanctions against Nevada because (1) the parties stipulated that all adversarial grounds for divorce and all contests or denials were "withdrawn;" and (2) the imposition of sanctions is an issue properly left for the chancellor to determine.

¶37. A stormy and tumultuous marriage made its way into an equally stormy and tumultuous divorce action between Nevada and Richard. There was ample proof of fights, misconduct, and bad deeds on both sides, causing the chancellor to find that "neither party made substantial contributions to the stability and harmony of the marital relationship."

¶38. However, the course of litigation, though still contentious, became limited to financial issues by agreed order entered August 10, 2005, granting the divorce on irreconcilable

17

differences grounds and limiting the issues on which the parties cannot agree to the following:

    a.      Property rights between parties;
    b.      Alimony;
    c.      Equitable distribution;
    d.      Valuation of assets;
    e.      Determination of and equitable distribution of all debts of the marriage;
    f.      Distribution of the real and personal property of the marriage;
    g.      Resolution of issues pertaining to income tax deductions, sharing of income tax refunds or liability, etc.
    h.      Determination of assessment of court costs, expert fees, and attorney's fees;
    i.      Determination as to what, if any, marital waste has taken place and assessment for such waste;
    j.      Legal interest on and judgments rendered by the Court;
    k.      Any and all financial issues.

¶39.    Not only does the order restrict issues before the chancellor to financial issues but it specifically states that all adversarial grounds for divorce and all contests or denials are "withdrawn." No issue of sanctions for Nevada's conduct in committing perjury or in destroying her computer was raised by Richard at the time of this order.

¶40.    This order was rendered pursuant to Mississippi Code Annotated Section 93-5-2(3) (Rev. 2004) which provides that "[a]ppeals from any orders and judgments rendered pursuant to *this subsection* may be had as in other cases in chancery court *only insofar as such orders and judgments relate to issues that the parties consented to have decided by the court.*" Miss. Code Ann. § 93-5-2(3) (Rev. 2004) (emphasis added). *See **Singley v. Single**y*, 846 So. 2d 1004, 1013 (Miss. 2002) (the court cannot try matters outside the pleadings absent agreement by the parties).

18

¶41.  Two months later, on October 24, 2005, Richard filed a motion for sanctions related to alleged perjury made by Nevada during a deposition on March 8, 2005.[3]  This was followed by a second motion for sanctions on October 31 for Nevada's actions in destroying her personal computer, which contained a "Dear John" letter, after the above-referenced deposition.[4]  Each of these motions could be related only to issues of fault rendered moot by the August 10 order.

¶42.  Neither of the objects of these motions was listed as an issue in the agreed order.  The chancellor did address allegations made in the motions but did so as a part of his analysis of the *Ferguson* factors, noting and taking into consideration that Nevada did not have clean hands in the court proceedings and that neither had contributed to a harmonious marriage. *Ferguson v. Ferguson*, 639 So. 2d 921 (Miss. 1994).  While Nevada admittedly had committed perjury during her deposition and had destroyed her computer, she also filed a motion for sanctions against Richard, alleging that he too committed perjury.

¶43.  This Court should not second-guess the decision of the chancellor denying sanctions in a highly charged and contentious proceeding such as this one.  In *Brown v. State*, this Court declined to inquire behind the circuit judge's decision not to impose sanctions against the prosecutor for actions which took place before the judge. *Brown*, 986 So. 2d 270, 279 (Miss. 2008).  "The decision to impose sanctions for discovery abuse is vested in the trial

---

[3]  The first motion for sanctions was based on Richard's allegation that Nevada had committed perjury regarding her relationships with other men during their marriage.

[4]  Richard's request in the second motion for an order "presuming that the 'Dear John' letter at issues was written by Nevada in its entirety" is without merit, as Nevada stipulated and agreed that she was the author of the letter.

court's discretion." ***Pierce v. Heritage Props***., 688 So. 2d 1385, 1388 (Miss. 1997) (quoting

***White v. White***, 509 So. 2d 205, 207 (Miss. 1987)); see also ***Tinnon v. Martin***, 716 So. 2d

604, 611 (Miss. 1998).

¶44.   Because I believe the chancellor's actions in refusing to award sanctions against

Nevada was discretionary, I respectfully concur in part and dissent in part.

   **GRAVES, J., JOINS THIS OPINION.**