IRVING, J.,
for the Court.
¶ 1. Tonia and Drake Lewis were divorced by the Harrison County Chancery Court after fifteen years of marriage. In its judgment, the chancery court made an equitable distribution of the marital estate. Feeling aggrieved, Drake appeals and asserts that the chancery court erred in classifying certain property as marital and in its equitable distribution as to multiple pieces of property.
¶ 2. Finding error, we affirm in part and reverse and remand in part.
FACTS
¶ 3. Tonia and Drake were married on March 2, 1991, in Missouri. Three children were born during the course of the marriage. In June 2006, Tonia and Drake separated due to Drake’s affair with a family friend. During the course of their marriage, Tonia and Drake formed and operated together a company called Legacy Holdings (Legacy). Multiple pieces of property were bought, improved, and either sold or rented by the parties on behalf of Legacy.
*235 ¶ 4. Tonia filed a complaint for divorce on August 30, 2006. No responsive pleading was filed by Drake. Trial was held in July 2007. At the conclusion of the trial, the parties were given the opportunity to submit proposed findings of fact and conclusions of law. Tonia submitted proposed findings, but Drake never submitted anything.
¶ 5. On January 11, 2008, the chancery court issued its judgment, wherein the court granted Tonia a divorce on the ground of adultery, and attempted to make an equitable distribution of the marital estate. At the outset, the chancery court noted that it had “the opportunity to observe the demeanor of the witnesses, and to judge their credibility!;, and] that [Drake] is not a credible witness. He made efforts to hide assets and income .... ”
¶ 6. Additional facts will be related, as necessary, during our analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUES
¶7. Our supreme court has discussed the appellate standard of review in divorce cases as follows:
“Our scope of review in domestic relations matters is limited by our familiar substantial evidence/manifest error rule.” Clark v. Clark, 754 So.2d 450, 458 [ (¶ 48) ] (Miss.1999) (citation omitted). “The equitable distribution of marital assets is committed to the discretion of the chancellor, whose findings will not be disturbed ... unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied.” Arthur v. Arthur, 691 So.2d 997, 1003 (Miss.1997) (citation omitted).
Jones v. Jones, 995 So.2d 706, 712 (¶ 19) (Miss.2008). Drake contends that the chancery court erred in its distribution of numerous pieces of property; for clarity’s sake, we address each separately below. Despite the stringent standard of review applicable to this case, we find that the chancellor was manifestly wrong in his treatment of the marital assets.

1. Legacy Holdings

¶ 8. Drake contends that the chancery court “made its determination about Legacy Holdings based on Exhibits 1, 4, and 7, all of which were offered by ... Tonia.... Drake asserts that these three exhibits are contradictory, inaccurate, and unreliable.... ” Drake essentially contends that Legacy is worth almost nothing and that it holds no property other than some equipment and vehicles.
¶ 9. In its judgment, the chancery court stated the following about Legacy:
In 2001, the parties formed Legacy Builders, Inc. Its office was in the marital home from 2001 to 2003, after which time it acquired a separate office. Tonia and Drake each owned 50%. Legacy built speculation homes and custom built homes for others. Beginning in 2001, the parties derived most of their regular income from Legacy.
Tonia and Drake continued to invest in other real estate holdings, many times at the suggestion of Drake’s father. They purchased a lot in Livingston, Louisiana (Suma Hills) to build a speculation home. They purchased real estate with his father in Missouri (Richland Road)[,] and during the divorce litigation this land was sold with each receiving $132,000.00 net profit. They purchased other real estate with his father in Missouri (Grasslands)[,] and during the divorce litigation Drake and Tonia sold their interest for $93,000.00. They purchased more lots in Ocean Springs, Mississippi, (Pinehurst)[,] on which Legacy *236 was building spec homes at the time of the trial.
# * * * * *
After being formed in 2001, Legacy’s business grew quickly. An analysis of its tax returns (Exhibit 8) and records shows a pattern of gross sales as follows:
2001-$612,699.00;
2002-$811,947.00;
2003-$2,491,294.00;
2004-$2,068,778.00; and
2005-$2,397,266.00.
Its “total assets” as shown on its tax returns’ balance sheets also is revealing:
2001-$1,950.00;
2002-$l,622,861.00;
2003-$l,621,603.00;
2004-$l,556,589.00; and
2005-$2,219,539.99.
The parties’ July 2006 Personal Financial Statement (Exhibit 4) showed as follows:
Total Other Assets-$1,756,645.88 (includes Legacy Holdings, Inc[.,] at $1,148,270.48);
Total Liabilities-$108,381.23; and
a net worth of $1,648,264.65.
At trial, Drake’s testimony painted a totally different financial picture of the status of Legacy’s sales and assets and the value of the marital estate. His testimony was substantially contradicted by the documentary evidence. Much of Drake’s posturing for a “poor” financial condition appears to be motivated by his own desire to abandon his marriage to Tonia....
* * * * * *
At the temporary hearing in September 2006, Drake presented his financial declaration (Exhibit 2) showing his sole income from Legacy of $4,300.00 per month (gross). Based upon these representations, the [c]ourt ordered Drake to pay Tonia $2,776.00 per month in support, her house note of $1,346.00, her car note of $544.00 per month, and her car insurance of $217.00 per month.
Following the temporary hearing, Drake began to surreptitiously draw an additional $4,300.00 per month from Legacy as a repayment by Legacy to Drake for loans they both had made to the company. The records show that Tonia and Drake had loan receivable balances from Legacy as follows:
Exhibit 2a-$156,555.10 as of July 2007;
Exhibit 7-Legacy Balance Sheet shows $147,855.00.
Drake failed to show this asset on his 2006 financial statement (Exhibit 2). Between September 2006 and April 2007 Drake drew $28,848.00 from Legacy as a loan receivable. (Exhibit 9). This money represented a marital asset belonging to both parties, to which he had no unilateral right.
Additionally, in furtherance of his attempts to control the cash assets of the parties and/or Legacy, Drake began doing business as Legacy Builders, a sole proprietorship in September 2006. Drake included Legacy’s ongoing work in this new sole proprietorship. He opened a new checking account under this name, purportedly so that Tonia could not get any of the money.
* * * * * *
The [c]ourt finds from the evidence that the following assets were owned by either or both of the parties at the time of the separation of the parties in June 2006:
* * * * * *
*237 [[Image here]]
(Footnotes omitted).
¶ 10. It is clear from the chancery court’s judgment that it primarily considered exhibits one, four, and seven in reaching its determinations as to Legacy’s value. Exhibit one is Tonia’s financial declaration. Exhibit four is Tonia and Drake’s financial statement, dated July 1, 2006. Exhibit seven is the Legacy Builders/Holdings balance sheet, dated July 18, 2007. We examine the contents of these exhibits to ascertain the propriety of the chancellor’s valuation of Legacy.

a. Exhibit One, Tonia’s Financial Declaration

¶ 11. Exhibit one, Tonia’s financial declaration, included a statement of assets. The statement indicated that lots fifteen and sixteen of the “Grasslands subdivision” had been purchased by Legacy and then sold by Drake for $95,000. Tonia’s testimony confirmed that this property was sold “to an investor there in Columbia” for $95,000. Drake’s attorney then offered to stipulate that the Grasslands property had been sold, was marital property, and was worth “[ajbout [$]91,000,” rather than $95,000.
¶ 12. A “Richland Road” property in Missouri was also listed as having been purchased by Legacy and then sold, with each party receiving proceeds of around $182,000 from the sale. Tonia indicated that this property was sold to Drake’s father during the pendency of the divorce.
¶ 13. The statement indicated that lots one to four in the Pinehurst subdivision had been purchased by Legacy. The statement further indicated that the lots currently held an equity of $71,701. Tonia testified that these lots were purchased in order for Legacy to build “speculative homes on.” Tonia further testified that three of the houses had not been completed as of the time of trial. Tonia answered affirmatively when asked whether her statement provided “the value of those three parcels plus the dirt ... unimproved.”
¶ 14. Ten acres in “St. Martin” were listed as having been purchased by Legacy with “personal monies from sell [sic] of personal properties.” The St. Martin acreage was valued by Tonia as worth $200,000. Tonia testified that the St. Martin acreage was actually less than ten acres, although she did not indicate how much less. Tonia further testified that she and Drake discussed the purchase of the property before doing so, and that they had decided “to put duplexes on the properties and keep the duplexes as rental units.” Tonia indicated that she was involved with helping to prepare the property for the duplexes. When asked whether she knew where the money to purchase the St. Martin property came from, Tonia indicated that she did not, despite her financial statement, which indicated that the acreage was purchased by Legacy with “personal monies.” During cross-examination, as discussed in more detail later, Tonia admitted that the St. Martin acreage was acquired by exchanging it for a piece of property that was titled solely in Drake’s name.
¶ 15. Finally, Tonia’s statement valued Legacy itself as worth $1,064,778.76, as of a balance sheet dated June 30, 2007. To *238 nia testified that Legacy’s financial records “are kept in QuickBooks format.” She further testified that she went into Quick-Books “under the memorized reports [to] print off financial statements.” She stated that the total value of Legacy on her statement came from the “number off of the balance sheet that came from the office.” During cross-examination, Tonia admitted that her valuation of Legacy in exhibit one did not include any of Legacy’s liabilities, although Tonia stated that it was possible that the numbers that were used for the assets included their value minus liabilities. Essentially, Tonia did not know anything about what the number on her financial statement actually encompassed.

b. Exhibit Four, Tonia and Drake’s Financial Statement

¶ 16. Exhibit four, Tonia and Drake’s combined financial statement, is a one-page document that is dated “[a]s of 7/1/06.” This statement was offered into evidence by Tonia; she testified that she did not enter the information on it, and that she obtained it simply by printing it from the home computer. Tonia indicated that she believed that Drake had entered the information on the document, which values Legacy as worth $1,148,270.48. Tonia testified that she printed the statement from the computer shortly after her separation from Drake, because she was afraid that he would dispose of “monies.” During cross-examination, Tonia admitted that some property was not included that should have been, that some property was valued at an amount greater than it eventually sold for, and that, ultimately, exhibit four was not accurate in several respects. The value of Legacy on the sheet is stated without any explanation of how the amount was calculated, and nothing is shown to indicate what assets and liabilities of Legacy were considered in the calculation.
c. Exhibit Seven, Legacy Balance Sheet
¶ 17. Exhibit seven appears to include a pamphlet for Legacy Builders; a balance sheet for Legacy Builders dated July 18, 2007; and some stockholder documents related to Legacy. Neither the pamphlet nor the stockholder documents contain anything that could have been used to value Legacy. Therefore, we focus only on the included balance sheet. The balance sheet indicated that Legacy had total then-current assets worth $289,211.03, a figure that included bank accounts and the value of speculation homes, among other items. The balance sheet also indicated that Legacy had “other assets” worth $1,984,740.89, which included tools, rental income, and unimproved property, as well as other items. The balance sheet therefore showed total assets worth $2,273,951.92. The balance sheet also listed total liabilities of $1,209,711.74. The sheet finally noted equity worth $1,064,240.18, primarily from “Opening Bal Equity.”
¶ 18. At trial, Tonia testified that she obtained the Legacy balance sheet from Legacy’s office on July 18, 2007. Tonia testified that she used the equity from the balance sheet to value Legacy on her own financial statement. Tonia admitted, during voir dire, that the balance sheet is only as accurate as the information that has been put into it, and that no accountant had ever performed an audit of Legacy. During voir dire as to her ability to testify about the accounting software used at Legacy, Tonia further admitted that she did not enter the information on Legacy’s computer herself, and that she had not validated the information on the balance sheet:
Q. Excuse me. I didn’t mean to — this balance statement that appears in Exhibit Number 7 that says—
*239 A. Yes.
Q. —Legacy Builders, have you gone back and validated any of these items that are listed here?
A. No. I have — I went in and I pulled up — the way that the information is entered into the computer, you go in, and there is a memorized report under financial statements, and it has been preset to what categories it pulls into that statement.
During cross-examination, Tonia admitted that exhibit seven’s figures were inaccurate. She specifically admitted that several properties were included as assets when they had, in fact, been sold prior to July 18, 2007. Tonia also admitted that the St. Martin acreage was not owned by Legacy at all, even though it was included in exhibit seven. She further admitted that, although the Richland Road property was included as an asset of Legacy worth $936,250, it had been sold prior to trial for approximately $264,000. She also admitted that the Richland Road property was not even really an asset that belonged to Legacy, as she and Drake had split the proceeds from its sale. Tonia further admitted that the marital home was included in exhibit seven, even though it was not owned by Legacy.
¶ 19. Having reviewed all of the aforementioned exhibits, it appears that the chancellor chose to use exhibit four as a valuation of Legacy’s worth, as the value that he assigned to Legacy is the same as the value of Legacy in exhibit four. We find that this decision was in error. First, Tonia admitted that this document, as well as her other submitted documents, was inaccurate in several respects. More troubling is the fact that exhibit four does not indicate, in any way, how the value of Legacy was determined. Of course, this would have been acceptable if Tonia was able to testify as to how the value was calculated. However, Tonia essentially testified that she did not enter the data in question; rather, she simply hit the “print” button on the family’s home computer to obtain exhibit four. Essentially, she did not know what the valuation of Legacy in exhibit four included or did not include. Despite the deference due to a chancellor’s findings, we find that the chancery court abused its discretion in using the valuation from exhibit four. For all intents and purposes, the value of Legacy in exhibit four was pulled out of thin air.
¶ 20. The valuation in exhibit seven suffers from similar deficiencies. Tonia presented the document but admitted that she had not entered the information on the balance sheet, that she did not know how accurate it was, and that she had simply hit the “print” button on the office computer to obtain the balance sheet. In fact, during cross-examination, Tonia admitted that multiple items on exhibit seven were inaccurate. We find that exhibit one, Tonia’s personal financial statement, was not any better, since Tonia testified that the value of Legacy on her financial statement was simply from the balance sheet that she had printed at the office. Had Tonia reviewed the balance sheet, she would have realized that it was not accurate. Essentially, neither exhibit one, exhibit four, nor exhibit seven present any information that could reasonably be used to value Legacy, yet the chancery court attempted to use them to do exactly that. On remand, the chancellor should not rely on these documents to value Legacy.
¶ 21. During cross-examination, Tonia admitted that Legacy has not made any money in the last five years. She also admitted that Drake has periodically had to make loans to Legacy. Tonia agreed that Legacy’s tax returns had shown losses for the five years preceding trial. Drake *240 essentially testified at trial that Legacy had no assets other than some equipment. This testimony was contradicted by evidence that the parties considered multiple pieces of property that were owned by them to be held only for Legacy’s use, regardless of whose name was on the deed for the property.
¶ 22. Tonia urges this Court to find that the chancery court’s valuation is supported by Legacy’s federal income tax returns. This logic fails for multiple reasons. First, the chancery court’s judgment did not indicate that it was using the tax returns to value Legacy.[1] Furthermore, Tonia urges us to look only at the assets claimed by Legacy, and not its tax return liabilities, which were often significant. Finally, the tax returns are no better in terms of explaining why Legacy was worth the amount claimed on the tax return. Without more support as to why Legacy was worth the amount claimed on the tax returns, we decline to find that they provide sufficient support for the chancellor’s valuation.
¶23. On remand, the chancery court should value Legacy using: (1) any real property owned by Legacy; (2) any other property owned by Legacy, such as vehicles or tools; (3) goodwill equity, if any, attributable to Legacy; and (4) any improvements that Legacy owns that are made to real property owned by parties other than Legacy. In making these determinations, the chancery court should consider “that price at which [the business] would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts.” Singley v. Singley, 846 So.2d 1004, 1011(¶ 18) (Miss.2002).

2. Marital versus Non-Marital Properties

1124. Drake next claims that multiple pieces of property were incorrectly considered as marital, rather than non-marital, property. We address each of these separately below.

a. Tigerbend Apartments

¶ 25. Drake first claims that the Tigerbend Apartments, which the chancellor awarded to Drake, is non-marital property that was purchased for Drake by his father. The chancellor found that: “The [d]eed offered into evidence shows Drake’s purchase of his interest, along with his siblings, from a third party.... There is no proof of a gift or of any trust being the grantor or donor of the property.” We find that substantial evidence supports the chancellor’s findings as to this asset. Tonia and Drake claimed rental income from the property on their joint tax returns for years. Drake acknowledged the rental incomes but claimed that he had never actually received the rentals as income, and that he did not know where the money had gone. Tonia also testified that she did not think that she and Drake had received the rental incomes. Drake hypothesized that the property’s mortgage might have been paid with rental proceeds. However, it appears that the amount paid on the mortgage exceeds the amount of rental proceeds that were earned. No other non-marital source of funds was suggested as having paid down the mortgage. Furthermore, Tonia testified that she had assumed that the Tigerbend Apartments belonged *241 to her and Drake, and that she and Drake had had conversations to that effect.
¶ 26. Drake’s claim that the chancellor erred in finding that the Tigerbend Apartments is marital property is without merit.

b.Swam/p Road Acreage

¶ 27. Drake claims that this property was also property that was “originally owned by Drake’s parents, then was gifted to the children, with Drake getting a [one-half] interest.” The chancellor found that this acreage is marital property, and reasoned as follows: “The only evidence to support a non-marital status was Drake’s testimony that this was inherited by him and has a value of $15,000. Drake failed to offer any evidence of how the expenses related to the asset, e.g. property taxes, were paid.... Absent a showing beyond a mere demonstration of a non-marital status, this asset is marital and subject to equitable distribution.” At trial, Tonia appeared to know nothing about this property. She further ignores it in her appellate brief, except to state in a footnote that “Tonia makes no claim to the Swamp Road property!,] and the same was awarded to Drake.” While it is true that the property was awarded to Drake, if the property should not have been included in the distribution of the marital estate, its award to Drake does not solve that error.
¶28. Drake provided very little testimony about this property at trial, and it is true that there is no explanation of how expenses such as property taxes were paid. However, this Court is troubled by Tonia’s admission that she knew nothing about the property and “makes no claim” to it. On remand, the chancery court should reexamine the Swamp Road acreage and determine whether it was properly considered as marital property.
c. Shenandoah
¶ 29. Drake also contends that the Shenandoah property, which was awarded to Tonia, should not have been considered as a marital asset. Tonia admitted at trial that: “It was a piece of property that was originally purchased in the trust, and then I believe back in 2003, it was turned over to each of the children’s—each of the children got all the trust assets into their name, put into their names.” This property’s situation is almost identical to that of the Tigerbend Apartments. Drake and Tonia collected rental income from Shenandoah and reported it on their tax returns. However, Tonia indicated that the incomes that were reported on their tax returns were noting more than paper transactions, as Drake’s father actually kept the rental money. Regardless, the mortgage on the property was paid down during the marriage. Although Drake suggests that the rental incomes might have been used to pay down the mortgage, as with the Tigerbend Apartments, the rental income that was received appears to be less than the amount of the mortgage that was paid down. Drake provided no explanation for how the additional mortgage payments were made. As with the Tigerbend Apartments, Tonia testified that she and Drake had had conversations wherein they had discussed their joint ownership of Shenandoah. Substantial evidence supports the chancellor’s findings regarding the Shenandoah property.

d. Hickory Hills Lot 29

¶30. Drake does not explicitly raise Lot 29 of the Hickory Hills subdivision in the section of his brief claiming that the chancellor incorrectly categorized non-marital properties as marital. However, in the interest of thoroughness, we also address this property. There are two Hickory Hills lots at issue in this case: Lot 29 *242 and Lot 13. Lot 13 we will discuss in more detail later in this opinion. Lot 29 was not separately addressed by the chancellor in his judgment.
¶ 31. The record indicates that Lot 29 was accumulated by the parties during their marriage. Tonia testified that she and Drake paid property taxes on Lot 29 during the marriage. Her financial statement indicated that Lot 29 was titled jointly in hers and Drake’s names; the chancellor also found that the property was titled jointly in Tonia’s and Drake’s names. Drake admitted at trial that the property was jointly owned by Tonia and him. A quitclaim deed, provided as an exhibit, showed that Lot 29 was deeded to Drake and Tonia jointly. The chancellor found that this property was marital property that had been accumulated during the marriage. We find that substantial evidence exists to support the chancellor’s determination that this was marital property.

3. St Martin Property Exchange

¶ 32. Drake next claims that the chancery court erred in treating Hickory Hills Lot 13 and the St. Martin acreage as separate property. In its judgment, the chancery court valued Lot 13 as worth around ten thousand dollars and awarded it to Drake. The chancery court valued the St. Martin acreage as worth two hundred thousand dollars and awarded it to Tonia. Drake claims that this was in error, because Lot 13 was traded for the St. Martin acreage in a 1031 tax exchange.
¶ 33. The chancery court appears to have predominantly based its decision regarding the exchange on the fact that the settlement statement provided by Drake regarding the 1031 exchange does not specify that Lot 13 of Hickory Hills was the property that was traded for the St. Martin acreage. Were there nothing else in the record, we might find that the chancellor was correct in finding that there were two separate pieces of property. However, the chancellor’s finding ignores Tonia’s own testimony. Tonia testified, in pertinent part, as follows during cross-examination:
Q. Okay. All right. Now, the — I want to talk to you a minute about the St. Martin property.
A. Yes.
Q. The 9.65 acres.
A. Yes.
Q. Do you even know how that property was acquired?
A. It was through — we sold some property, and I don’t recall if it’s the property from Missouri or if it was from the sale of the condo that we were living in and — actually I believe it was from the property-it went into an exchange for tax purposes, and I believe it was acquired that way.
Q. Do you know what a 1031 exchange is?
A. I have heard it [sic]. I don’t know details about it.
Q. Okay. Isn’t it a fact — and if you don’t know, you just tell me.
A. Okay.
Q. Isn’t it a fact that the St. Martin property was acquired in a 1031 exchange with trust property that was given to [Drake] solely? In other words, the trust gave [Drake,] solely in his name[,] deed to a piece of property that was exchanged in a 1031 exchange for the St. Martin property?
A. What trust piece of property are we talking about?
Q. Two acres in Hickory Hills. That was trust property that was given in his name only, correct?
*243 A. It was in his name, yes.
Q. Okay. And isn’t it a fact that that two acres in Hickory Hills was exchanged, because it was in his name only, exchanged in a 1031 exchange for the St. Martin property?
A. I believe that’s how it was done.
Q. Your name was never placed on the Hickory Hills property, was it?
A. No, it was not.
Q. And your name was never placed on the St. Martin property?
A. It was not placed on the St. Martin property, no.
(Emphasis added). Although neither Drake’s attorney nor Tonia specifies that Lot 13 was exchanged for the St. Martin property, there are only two Hickory Hills properties that the parties have owned. Tonia claimed that Lot 29 was titled jointly in hers and Drake’s names. Her financial statement did not list Lot 13 at all-presumably because it had been swapped for the St. Martin acreage at that point. During direct examination, Tonia testified that she thought that the St. Martin acreage might have been purchased with proceeds from the sale of property in Missouri; however, this is belied by her later admission that the St. Martin acreage was gained through a 1031 exchange with a Hickory Hills lot that was titled in Drake’s name only.
¶ 34. Tonia’s own admission corroborates Drake’s testimony about how the St. Martin acreage was acquired. Therefore, we reverse and remand on this issue as well. On remand, the chancery court should equitably divide the marital estate without the inclusion of Lot 13, which Tonia admitted at trial no longer exists as a separate piece of property. The chancery court should also reconsider whether the St. Martin acreage is marital property, as Tonia testified that Lot 13, which was traded for the St. Martin acreage, was titled solely in Drake’s name. Tonia also admitted that the St. Martin property is titled solely in Drake’s name. In light of the 1031 exchange, the chancery court should reconsider whether this property is marital.
A Loan to Legacy
¶ 35. In his final contention of error, Drake claims that the chancery court erred in awarding him the value of a loan and in considering the repayment of the loan as income. The loan at issue was made by Drake and Tonia to Legacy; the chancellor valued it as worth $156,555. Drake’s gross income as reported on his financial statement is $4,730 per month; however, he claims that his “net income extrapolated from the child support amount would be $7,300 ($1,606 divided by 22 equals 1%, multiplied by 100), which sum adds into his income the loan repayment.”
¶ 36. Assuming that Drake’s calculations are correct, we still decline to find that the chancellor erred. We know of no provision of the law that states that income can only be considered if it is achieved from non-diminishing assets; Drake has provided no citation to the contrary.[2]
¶ 37. Therefore, we find that this issue is also without merit.

5. Conclusion

¶ 38. On remand, the chancellor must revalue Legacy using all relevant data, rather than relying on Tonia’s admittedly inaccurate exhibits. The chancellor must also consider whether the Swamp Road acreage is marital property in light of To *244 nia’s statements regarding the property, and whether the St. Martin property is marital property in light of the 1031 exchange. After considering all of these things, the chancellor must address the proper value of the marital estate and then make an equitable distribution of the marital estate, taking into account the new value of Legacy and any other property which has undergone a change in marital status. In so doing, the chancellor must not consider Lot 13 of Hickory Hills, which both parties agreed is no longer owned by either party.
¶ 39. THE JUDGMENT OF THE CHANCERY COURT OF HARRISON COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED ONE-HALF TO THE APPELLANT AND ONE-HALF TO THE APPELLEE.
KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ, CONCUR.

. In denying Drake's posttrial motion to reconsider, the chancery court referenced Legacy’s tax returns. However, the court declined to alter its valuation of Legacy as a result, meaning, essentially, that the value of Legacy was still determined based on exhibit four.

. We accept that the chancellor's treatment of the loan will most likely mean that the amount of child support will have to be adjusted in the future, once Drake has recouped the value of the loan.